33409. MAYO *v.* McCLUNG *et al.*

Decided March 16, 1951.

550

*G. Seals Aiken,* for plaintiff.

*John A. Dunaway, James A. Branch, Thomas B. Branch Jr.,* for defendants.

GARDNER, J. ▮ As to the first question, there are involved the following contentions: (a) was there any evidence of malpractice or negligence on the part of the defendants under the general grounds, and whether, in connection therewith, special grounds 6, 7, 8, and 10, pertaining to the admissibility of certain evidence, are meritorious; (b) whether the undisputed fact that the plaintiff received compensation for her alleged injury under the Workmen's Compensation Act barred her from recovery in the present action after she had been awarded and received the compensation from her employer or insurance carrier as an employee under the Workmen's Compensation Act. The judgment of the court does not reveal whether the court directed the verdict on no proven negligence on the part of the defendants or whether the verdict was directed because the claimant had received compensation under the Workmen's Compensation Act. In the outset, after a careful consideration of the evidence and under all the issues involved, the controlling question is whether the evidence demanded a verdict for the defendants under the general grounds, provided the court did not commit reversible error in ruling on the admissibility of testimony as contained in special grounds 6, 7, 8, and 10. From this viewpoint all other assignments of error and contentions of the plaintiff are eliminated from our decision.

The plaintiff filed her suit against the doctors (the defendants) because of alleged malpractice. Her petition and the evidence in support thereof show that she fell down while at work

in the apartment hotel in which she lived. One of the defendants, Dr. McClung, was called. He diagnosed her injury as a strained muscle, put her to bed, and gave her capsules to relieve her pain. The pain persisted about two weeks. Afterwards she was x-rayed and found to have suffered an impacted fracture of the left leg. She was then placed in a cast which she wore for some time, and which was afterwards removed. The result to the plaintiff was that she suffered an absorption of the neck of the femur, resulting in a fibrous union at the site of the fracture and a definite shortening of the left leg. It is her contention that this unfortunate result was caused by the defendants in improperly diagnosing her condition; in failing to take x-rays, in that the treatment given her by the defendants caused the absorption of the neck of the femur and the fibrous union and the shortening of the leg. The only medical evidence in the record was furnished by Dr. Randolph Smith, a witness for the plaintiff. Dr. Smith testified in part as follows: "As to whether, in the area of the capsule, there is practically no blood supply. There is blood supply but the blood supply in that area is very poor, as compared to the rest of the bony tissues in the body. As to whether that was the reason why I stated that I ruled on the question of callus in an intra-capsule fracture of the neck of the femur: Well, in an intra-capsule fracture the neck of the femur, your callus is not demonstrable, you can't show it, it doesn't show in x-ray; it is practically nil.

"As to whether, in elderly people particularly, you get the sort of result that Mrs. Mayo has in at least 50% of the cases, in that kind of a fracture in the inside of the capsule in the neck of the femur [a hypothetical question]: No, that percentage is high; different individuals get different results; the best figures that anybody has ever been able to produce on fractures in the neck of the femur is a good result in 80% and a bad result in 20%; they vary from there all the way up and down. As to whether the best average that anybody can get is to miss at least 20% of them [a hypothetical question]: That's the best that has ever been done, and that is not because of anything the doctor has failed to do that medical attention requires him to do.

"As to whether, if a patient falls in the basement of a build-

ing and receives an impacted fracture of the neck of the femur, such as you say I saw when I examined her, and walks up the steps and was able to turn her foot and the doctor saw her that day and saw her periodically for a period of about two weeks and there is no displacement but an impaction of that fracture, it can be said that it is bad medical practice not to x-ray the patient for that period of time [a hypothetical question]: As to whether, in elderly people, it is usually the practice to treat a number of patients before I do anything about reducing the fracture for a while: Frequently that is more necessary than the fracture; sometimes they have shock and other conditions which require me to wait a period of some time, sometimes a number of days and it may be advisable even to wait for two weeks, under those circumstances; good medical practice sometimes requires that I wait two weeks. The fact that I immediately take the patient and put the patient in a cast or wait, in the judgment of the doctor, until the proper time doesn't have anything to do with whether or not the patient is going to have an absorption in the neck of the femur; the blood supply in the neck of the femur determines whether or not there will be an absorption. As to whether, in my opinion, I could say that if this lady had been x-rayed and the fracture reduced the day she fell, that she would not have had an absorption: One couldn't say so. In other words, the fact that there was an absorption in the case very probably that there would have been an absorption under any conditions; and I could not attribute the absorption and her present condition to the failure to x-ray on the day or any time during that first two weeks. . . Waiting to set the fracture after impaction, you don't have to set the fracture, if there is impaction, you let it alone, you don't make any attempt to set it. As to whether frequently I don't even put it in a cast: Well, you should immobilize it either externally or internally. If all these physicians had to do was merely to determine that there was a fracture, that it was impacted, and put it in a cast two weeks after the fracture occurred, if it was still in place, no injury resulted from the delay of two weeks in reducing it from the day of the fracture; if you have a picture and two weeks afterwards you still show impaction, it doesn't make any difference whether you put

it in a cast the previous week or at that time. If there was impaction on August 14th, when she was first examined and when she was put in the cast, absolutely no injury from the failure to put it in a cast resulted in her case."

Counsel for the plaintiff contends that there was lay testimony and medical testimony as to the negligence of the defendants. The record does not bear out this contention of the plaintiff under the law of this State appertaining to the question now before us. See *Pilgrim* v. *Landham*, 63 *Ga. App.* 451 (11 S. E. 2d, 420). See also, *Branch* v. *Anderson*, 47 *Ga. App.* 858 (171 S. E. 771); *Bryan* v. *Grace*, 63 *Ga. App.* 373 (11 S. E. 2d, 241). Thus it will be seen that, under the testimony of the physician, the result was that which obtained in about 20% of such cases as are now under consideration, and medical science does not yet know how to prevent such results. This seems to be a question purely for expert medical evidence. It is true that a layman may testify as to results, but not whether the treatment in cases such as the one we now have before us was the failure of the doctors to use care and diligence in the treatment and diagnosis. Therefore, it follows that the court did not err in directing the verdict as to this phase of the case as to the general grounds, if the court was correct in its ruling on special grounds 6, 7, 8, and 10. Let us inquire as to special grounds 6, 7, 8, and 10.

■ ■ Special grounds 6 and 7 complain of the sustaining of objection by counsel for the defendants to questions propounded by counsel for the plaintiff to Dr. Smith as to whether in his opinion it was advisable for a surgeon treating a fracture of a hip to wait two weeks before taking an x-ray. We think the objections were correctly sustained. The issue was whether the treatment given the plaintiff by the doctors measured up to the standard as prescribed by the Code, which, "when applied to the facts and circumstances of any particular case, must be taken and considered to be such a degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by the profession generally." *Bryan* v. *Grace*, 63 *Ga. App.* 373 (1a) (11 S. E. 2d, 241). It was not a question of what one individual doctor thought was advisable.

■ Special ground 8 complains because the court sustained an objection made by counsel for the defendants to a question

propounded to Doctor Smith as follows: "Now, with reference to the reconstructive operation that you referred to, doctor, I would ask you whether or not in your opinion, from your experience, you can expect to get as satisfactory results from that kind of an operation as you could expect to get from the prompt reduction of a fracture following the occurrence of the injury." This question had no bearing upon any issue from all the evidence in the case, and it was immaterial.

Special ground 10 complains of the refusal of the trial court to allow counsel for the plaintiff to question Dr. Smith, his own witness, as to whether the defendants and Dr. Smith were insured by the same insurance company. The court properly refused counsel for the plaintiff to propound such question. We think this is true for two reasons: First, because the insurance policy itself would be the highest and best evidence of such facts, if admissible at all; and second, that question tended to impeach the plaintiff's own witness when no proper showing of entrapment was made.

The court did not err in directing a verdict in favor of the defendants, because the evidence demanded that verdict. The court did not err in its ruling as to the admissibility of evidence as contained in special grounds 6, 7, 8, and 10. Since the evidence demanded a verdict for the defendants under the petition for malpractice and since the court committed no error in its ruling as to the admissibility of evidence as to this feature of the case, such rulings are controlling and it becomes unnecessary to pass upon all other assignments of error in the record.

*Judgment affirmed. MacIntyre, P.J., and Townsend, J., concur.*