40747.   WORD v. HENDERSON et al.

Decided November 20, 1964—Rehearing denied December 8, 1964.

*Harold S. Willingham, Hicks & Howard, G. Robert Howard,* for plaintiff in error.

*Edwards, Bentley, Awtrey & Parker, Scott S. Edwards, Jr., A. Sidney Parker, Reed, Ingram & Flournoy, Lawrence B. Custer,* contra.

EBERHARDT, Judge. 1. The plaintiff charged in her petition that the defendant hospital was negligent in giving her child a lethal dose of Demerol and in not giving the child a proper dose of Demerol. Clara Jenkins, the nurse who administered the alleged improper dose of Demerol, stated in her affidavit filed in behalf of the defendant hospital's motion for summary judgment that she gave the decedent 25 milligrams of Demerol in accordance with the physician's instructions. The uncontradicted evidence disclosed that this was a proper dosage for a child of the decedent's age. In a deposition taken by the plaintiff, Nurse Jenkins stated that the shot contained ½ cubic centimeter of Demerol solution. Plaintiff testified, however, that she observed the shot being administered to her son and that the fluid column of the shot given to him was at the 2 cubic centimeter position on the hypodermic syringe. Under the evidence a finding was authorized that 2 cubic centimeters of the Demerol solution would contain at least 100 milligrams of Demerol, an admittedly dangerous dosage for a child of the decedent's age.

Clearly, there was a conflict in the record as to the volume of Demerol solution administered to the plaintiff's child, and in view of Dr. Coker's testimony that 100 milligrams of Demerol could produce death, it cannot be said that the conflict was not material. The question of whether the defendant hospital actually gave an improper dosage of Demerol to the decedent, whether that was negligence, and if so, whether the negligence proximately caused the child's death were likewise questions to be resolved by the jury. The fact that no Demerol was found in the tissues of the decedent, which were subjected to chemical analyses by officials of the State Crime Laboratory, was strong evidence that the child had not been given an overdose in view of the testimony of Dr. Matthews, who stated that in his opinion if the child had been given an overdose of Demerol, deposits would have been found upon analysis. It was for the jury to weigh and consider this evidence, however.

Counsel for the defendant hospital contend that even if the evidence authorized the finding that the plaintiff's decedent was given an improper dosage of Demerol, there was no evidence that it proximately caused the death. This contention is with-

out merit, since under the testimony of Dr. Coker the jury would be authorized to find that the overdose of Demerol proximately caused or contributed to the death of the plaintiff's child.

2. It was incumbent upon the plaintiff, in order to withstand Dr. Henderson's motion for summary judgment, to produce evidence by other physicians from which a jury could find the want of due skill or diligence on the part of this defendant. *Hollis v. St. Joseph Infirmary*, 108 Ga. App. 309 (132 SE2d 841). This is true for the reason that in an action against a physician or surgeon for malpractice the presumption is that the medical or surgical services were performed in an ordinarily skillful manner, and the burden is on the plaintiff to show a want of due care, skill or diligence. *Shea v. Phillips*, 213 Ga. 269, 271 (98 SE2d 552). "The proper standard of measurement for a jury to apply to the acts of a doctor to determine whether he exercised a reasonable degree of care and skill must be established by testimony of physicians, for it is a medical question." *Hayes v. Brown*, 108 Ga. App. 360 (1b) (133 SE2d 102); *Mayo v. McClung*, 83 Ga. App. 548, 556 (2) (64 SE2d 330); *Code* § 84-924.

The plaintiff assumed this burden by producing the affidavit of Dr. Grady Coker in which the affiant concluded upon the basis of hypotheses supported by evidence in the record that the plaintiff's child was suffering from post-operative shock at 10 a.m. on the morning of the operation (the time when the child was last seen by the defendant physician); that tests should have been made to determine whether the condition was one of post-operative shock and that the child should have been closely watched and checked to determine the course of the condition; that the child's condition was serious enough to warrant the care of a doctor at the time; that post-operative shock, if allowed to continue, could produce death, and that a 100 milligram dose of Demerol is grossly excessive for a child of his age and one which might produce death.

Let us examine the evidence to see whether there be any proof of negligence on the doctor's part that would give rise to a cause of action. Dr. Henderson performed the operation. There is no contention and no evidence of any negligence on his part in

connection with its performance. The only contention is the assertion that he failed to make tests or to give further attention to the child after he saw it at about 10 a.m., the basis being that there were circumstances existing which he should have observed at that time indicating that the child might have been suffering from post-operative shock and these should have led him to the making of further tests and the giving of further attention.

If there was proof of this it is to be found only in the affidavit of Dr. Grady Coker, in which he asserted: "In reaching the conclusions hereinafter stated and deposed in this affidavit, I am assuming the following fact to be true: . . . 4. (a) That Nathan Stephen Word was a colored male child of the age of 3 years four and one-half months old [sic] when he entered Kennestone Hospital, Marietta, Georgia, on September 18, 1961. I am assuming that said child at said time and place was healthy; (b) That said child was operated on at 8 a.m. on September 19, 1961, by Dr. Charles Henderson for tonsillectomy and circumcision and that said operation lasted approximately one (1) hour in duration [sic] and that said child was placed in the recovery room at approximately 9 a.m. that morning and was returned to his hospital room at approximately 10 a.m. of that morning. (c) That said child was administered a dose of Demerol in the approximate range of 100 MGM at 10:25 a.m. of that morning and that at approximately 12 noon of that morning said child died." (Then follows a cataloging from 7:35 a.m. until 10 a.m. of fluctuations in the child's pulse rate from a low of 78 to a high of 136 and his respiratory rate from a low of 18 to a high of 28 per minute). "(m) *That no doctor examined said child from 10 a.m. until the time of his death at approximately 12 noon;* (n) that said child received no treatment, other than said shot of Demerol and a vaporizer, which was brought into his room; (o) *That prior to his death and some time after 11 a.m. on September 19, 1961, said child began to turn a light or ashen color;* (p) That the clinical diagnosis of the cause of said child's death stated that the cause was unknown and that no anatomical explanation for death was found on gross and microscopic examination.

"5. It is my opinion, based on the above and foregoing hypotheses as set forth in Paragraph Four (4) and its subparagraphs, that said child was suffering from post-operative shock at 10 a.m. on September 19, 1961, and that other tests should have been made to determine whether the condition was one of post-operative shock and that he should have been closely watched and checked to determine the course of such condition.

"6. It is my further opinion that such condition is serious enough to warrant the care of a doctor until it be determined that the danger aspects of the shock condition had passed.

"7. It is further my opinion that a 100 MGM dose of Demerol is grossly excessive for a child of such age and one which might produce death to such child.

"8. It is further my opinion that post-operative shock, if allowed to continue unchecked, could produce death and that such dose of Demerol could produce death in such child and a combination of the two would be even more likely to produce death in such child." (Emphasis supplied.)

Plaintiff urges a construction of this affidavit to mean that Dr. Coker was testifying that *from the matters appearing at 10 a.m.* he concluded that the child was then suffering from post-operative shock and should have had further attention and tests made. We can not so construe it, for the doctor explicitly says twice that his opinion and conclusions are predicated upon the several hypotheses set forth in paragraph 4 and its subdivisions. He makes no exception. Consequently, the affidavit is a clear, unequivocal assertion that based upon the fact that the child *turned to a light or ashen color after 11 a.m. and died at 12 noon,* he was suffering from post-operative shock at 10 a.m. He did not confine or limit his conclusion or opinion to the matters that had transpired or appeared up to that time in reaching his conclusion as to what the condition may have been at 10 a.m.; rather he firmly planted it upon *every matter brought to his attention that happened up to the time of death* at 12 noon. The affidavit is not ambiguous.

Dr. Coker's opinion was thus simply a "hind-sight" judgment as to what the situation probably was at 10 a.m. Certainly we can not hold Dr. Henderson on the basis of a "hind-sight"

judgment. At 10 o'clock it was simply not possible for him to have known that the child would turn to a light or ashen color at about 11:00, or that he would die at 12:00.

Moreover, it is clear from the affidavit of Dr. Coker that, considering all the factors involved in paragraph 4 and its sub-paragraphs, it was his opinion (paragraph 5) that the child was suffering from post-operative shock at 10 a.m. on September 19, 1961, and that *based upon this conclusion* and assuming this condition to exist at that time, "other tests should have been made to determine whether the condition was one of post-operative shock and that" the child "should have been closely watched and checked to determine the course of such condition."

While it may be inferable that the probable condition of post-operative shock carried with it such observable indicia or symptoms as would indicate the need for other tests to determine the actual condition of the child, the affidavit of Dr. Coker fails completely to say what were these indicia or symptoms, upon which it is claimed the defendant physician negligently exercised his judgment. It must be observed in this connection that there is uncontradicted medical testimony in the record that the elevation of the pulse and respiratory rates in a child of that age do not indicate post-operative shock so long as they remain within the normal range and that the rates experienced by this child were within the normal range.

As was stated in *Shea v. Phillips,* 213 Ga. 269, 271, supra, "even jurors and courts, are not permitted to say what is proper medical and surgical treatment, for that is a medical question." It was, therefore, incumbent upon the plaintiff to produce the complete medical facts; otherwise, there would be insufficient facts upon which to base a conclusion from the medical testimony submitted.

We fully agree that the evidence and the pleadings are to be construed in favor of one who opposes a motion for summary judgment. But that rule has application only if these are ambiguous or are subject to more than one reasonable interpretation. If no construction is needed, then none is to be applied; the matter simply speaks for itself and does not require the court "by indirection to find direction out."

The judgment of the trial court is affirmed as to the grant of a summary judgment in favor of the defendant Henderson but reversed as to the grant of summary judgment in favor of the defendant hospital. All of the judges of the court concur as to the first division of this opinion and all concur as to the second division except Felton, C. J., Frankum, Jordan and Russell, JJ., who dissent as to it.

*Judgment affirmed in part; reversed in part. All the judges concur, except Felton, C. J., Frankum, Jordan and Russell, JJ., who dissent in part.*

JORDAN, Judge, dissenting. I dissent from Division 2 of the opinion holding that the record presents no genuine issue of material fact as to the alleged negligence of Dr. Henderson. In my opinion the affidavit of Dr. Grady Coker clearly makes it a jury question as to whether Dr. Henderson at 10 a.m. should have made other tests to determine whether the child's condition was one of post-operative shock and should have closely watched the patient until the danger aspects had passed.

One of the hypotheses stated in Dr. Coker's affidavit was, "that from the beginning of the checks on said child's pulse rate at 7:35 a.m. on the morning of September 19, 1961, to the final charted check on said child's pulse rate at 10 a.m. on said date, that said child's pulse rate had risen from 78 to 136, *an increase of some 58 heart beats per minute* and during the same period of time *said child's respiratory rate had increased from 18 to 24 breaths per minute,* having reached a high of 28 breaths per minute at 9:05 a.m. and following said operation and having changed from a high immediately following the operation to a low of 18, 15 minutes later, reaching the final charted respiratory rate measurement of 24 breaths per minute at 10 a.m." (Emphasis supplied.)

It is true that other hypotheses in the affidavit included the shot of Demerol at 10:25 a.m., the child turning an ashen color at 11 a.m., and his death at approximately 12 noon. On the basis of these stated occurrences *after* 10 a.m., together with the child's chart *prior* to 10 a.m., Dr. Coker was able to definitely state that in his opinion the child was in fact suffering from post-operative shock at 10 a.m. But Dr. Henderson's neg-

ligence does not depend on whether the child was in fact suffering from post-operative shock at 10 a.m., but rather, on the basis of the knowledge he had at that time, including the information on the child's chart, he should have made other tests and closely watched and checked the patient's condition.

This is the error made by the majority in construing Dr. Coker's affidavit. While his conclusion that the child was in fact suffering from shock at 10 a.m. might have been based on consideration of all the hypotheses shown in his affidavit, it is perfectly clear to me that his conclusion that other tests and observations should have been made at 10 a.m. is based solely upon the medical history of the child and the symptoms apparent at that time. In reading and giving consideration to the entire affidavit, as we must do, I think it is certainly susceptible of this construction. This affidavit was given by Dr. Coker on January 31, 1964. The record shows that a second affidavit was given by Dr. Coker on February 6, 1964, in which he attempted to explain what he did and did not intend to say with reference to the alleged negligence of Dr. Henderson. This lends credence to the position that the first affidavit was ambiguous and not entirely clear as to the conclusions of the affiant relative to the actions of Dr. Henderson.

Where the evidence on motion for summary judgment is ambiguous or doubtful, the party opposing the motion must be given the benefit of all reasonable doubts and of all favorable inferences and such evidence construed most favorably to the party opposing the motion. *McCarty v. National Life &c. Ins. Co.*, 107 Ga. App. 178 (129 SE2d 408).

The majority states that Dr. Coker's opinion "was thus simply a 'hind-sight' judgment as to what the situation probably was at 10 a.m." and that "certainly we cannot hold Dr. Henderson on the basis of a 'hind-sight' judgment." I think this is an unwarranted conclusion because the record clearly shows what the situation was at 10 a.m. with reference to the child's condition. Dr. Coker knew the situation as it existed at that time (on the basis of facts assumed from the records) and Dr. Henderson knew the situation when he last examined the child at 10 a.m. Therein lies the issue to be resolved, for Dr. Coker

states the situation warranted further tests and continued attention while Dr. Henderson states that the child suffered no complications and was in excellent condition. This clearly presented a question which was within the province of a jury.

The majority opinion states that the uncontradicted medical testimony in the record is to the effect that the elevation of pulse and respiratory rates in a child of decedent's age do not indicate post-operative shock so long as they remain within the normal range and that the rates experienced by this child were within the normal rate. I do not understand this to be correct, for while both Dr. Henderson and Dr. Benson testified that the normal range of pulse rate for a child· of this age would be 80-130 per minute, it is uncontradicted that the child's pulse rate rose from 78 to 136 from the time of the operation until 10 a.m. Both doctors testified that a rapid pulse rate and an increase in pulse and respiration are symptoms of shock, along with the skin being wet or clammy, pale skin, anxiety, etc. Nurse Jenkins testified that a "continuing increase in the pulse rate would be" a symptom of shock. This medical testimony is sufficient to show that the child certainly had some of the symptoms of shock at or prior to 10 a.m. and that the child's pulse rate had in fact exceeded the normal range.

Whether a physician has used that degree of care and skill required by *Code* § 84-924 is generally a question for the jury's determination. *Norton v. Hamilton,* 92 Ga. App. 727 (89 SE2d 809, 57 ALR2d 426), and cases cited. The same degree of care and skill is required in making a diagnosis as is required in treatment. In determining such issues, the jury may consider *all* the attendant facts and circumstances which may throw light on the ultimate question. *Fincher v. Davis,* 27 Ga. App. 494 (108 SE 905); *Pace v. Cochran,* 144 Ga. 261, 265 (86 SE 934). This includes the right to hear evidence as to facts occurring after the alleged negligence as well as to facts happening prior thereto, for as was stated in *Pilgrim v. Landham,* 63 Ga. App. 451, 455 (11 SE2d 420): "And where, measured by the method shown by medical witnesses to be negligence, the evidence shows a bad result, it is the province of the jury to say whether the result was caused by the negligence." A phy-

sician is required to inform himself of his patient's condition by proper examination such as would ordinarily be made under similar circumstances, and upon failure to do so, he is not relieved by error in judgment of liability for resulting injury. *Howell v. Jackson,* 65 Ga. App. 422 (3) (16 SE2d 45). Dr. Henderson's judgment in this particular situation has been made a material issue of fact by competent medical testimony in the plaintiff's favor.

It is my opinion that the affidavit of Dr. Coker, construing it in the light most favorable to the plaintiff, was sufficient competent medical testimony to establish a proper standard of measurement for a jury to apply to the evidence in this case to determine whether the defendant doctor exercised a reasonable degree of care, skill, or diligence; and that under the evidence here, when so measured, a jury question was presented as to the issue of the defendant doctor's negligence and whether it proximately caused the death of the plaintiff's child.

The trial court should not, therefore, have granted the defendant doctor's motion for summary judgment.

I am authorized to state that Felton, C. J., Frankum and Russell, JJ., concur in this dissent.