**Steve Miles ROBERTSON, etc., et al., Plaintiffs-Appellants,**

**v.**

**EMORY UNIVERSITY HOSPITAL, a corporation, et al., Defendants-Appellees.**

**No. 77-3219.**

United States Court of Appeals, Fifth Circuit.

Feb. 11, 1980.

R. Ben Hogan, III, Birmingham, Ala., for plaintiffs-appellants.

Hunter S. Allen, Atlanta, Ga., for defendants-appellees.

Before GEE, TJOFLAT and ANDERSON, Circuit Judges.

GEE, Circuit Judge:

Plaintiffs in this medical malpractice action, Steve Robertson, a minor, and his father, Frank Robertson, appeal from a directed verdict for the defendants, Emory University Hospital, Dr. George Tindall, and Dr. C. B. Fresh. After carefully reviewing the record, we affirm.

On March 26, 1974, Steve Robertson received head injuries in a fight. After arriving home around 9:00 p. m., Steve com-

plained of discomfort and asked to see a doctor. At 9:20 p. m., his parents took him to Clayton General Hospital, where he was seen by Dr. Selwyn Hartley, an emergency room physician. Although he did not feel emergency treatment was necessary, Dr. Hartley recommended that Steve see a neurosurgeon because of a skull fracture, revealed by x-rays, and symptoms of drowsiness, confusion, and lessened consciousness. Frank Robertson called Dr. George Tindall, Chief of Neurosurgery at Emory University Hospital (Emory), who told Mr. Robertson to bring Steve to Emory.

At 2:30 a. m. on March 27, shortly after his admission to Emory, Steve was examined by Dr. John Coleman III, a surgical intern. After administering a complete physical examination, Dr. Coleman found Steve oriented, cooperative, and awake but not particularly attentive. Although he noted some irregularity in Steve's speech, Dr. Coleman did not record any weakness on Steve's right side. He concluded that no emergency existed.

Dr. Coleman then telephoned Dr. C. B. Fresh, the neurosurgical resident on duty that night, who arrived at the hospital at about 3:30 a. m. After speaking with the Robertsons, who related the events leading up to Steve's arrival at Emory, Dr. Fresh examined Steve. Dr. Fresh observed that Steve had a "fairly dense weakness" on his right side, as well as irregularity in his speech. He concluded that these abnormalities resulted from a "focal cortical contusion in the front parietal area" of the brain [1] but did not rule out the possibility of a subdural hematoma. [2] Dr. Fresh ordered that Steve be kept under observation and instructed the nurses to perform neurological checks every hour. He also scheduled Steve for a cerebral angiogram [3] later in the day to determine whether Steve in fact had a subdural hematoma. After discuss-

ing his findings with Dr. Coleman and noting some discrepancies between his findings and Dr. Coleman's, Dr. Fresh called Dr. Tindall, who approved Dr. Fresh's handling of the case. It appears, however, that Dr. Fresh did not inform Dr. Tindall of the discrepancies between his and Dr. Coleman's findings. Dr. Fresh then went to bed in the call room, having instructed the nurses to call him if they had any questions.

At 7:00 a. m., Drs. Tindall and Fresh and another neurosurgical resident examined Steve and found no significant change in his condition. A nurse's notation, made at 6:30 a. m., similarly observed that the patient had been "essentially the same since admission." Accordingly, Dr. Tindall decided to continue the course of treatment previously prescribed and proceed with the angiogram as scheduled later in the day.

At around 10:00 a. m., when Steve was taken to the x-ray department for his scheduled angiogram, his condition suddenly deteriorated, and he fell into a deep coma. Shortly thereafter Dr. Mark O'Brien, a pediatric neurosurgeon, performed emergency surgery on Steve. The operation revealed two subdural hematomas, one five millimeters thick and the other one centimeter thick, and massive brain swelling, or cerebral edema. Dr. O'Brien removed a small portion of the brain from the temporal lobe to decompress the area.

Steve was subsequently treated to reduce the swelling. Although he showed temporary improvement, it became necessary to perform a second operation several days after the first to remove necrotic brain tissue that extruded through the suture. Steve is presently in a catatonic state that is presumed to be permanent.

Plaintiffs brought suit against Emory University Hospital, Dr. Fresh, and Dr. Tin-

---

**1.** In layman's terms, Dr. Fresh concluded that Steve had a bruise in the area of the brain associated with speech and facial movement.

**2.** A subdural hematoma is a blood clot located between the dura, a canvas-like membrane that sheathes the brain, and the brain itself.

**3.** A cerebral angiogram, also known as a cerebral arteriograph, is a diagnostic procedure in which x-rays of the brain are taken after contrast media have been injected into the patient's bloodstream. Cerebral angiography is widely used for diagnosing the presence of subdural hematomas.

dall, alleging the following acts of negligence: (1) Dr. Fresh's failure to take an angiogram after his initial examination; (2) his failure to inform Dr. Tindall of the discrepancies between his and Dr. Coleman's findings; (3) Dr. Tindall's failure to supervise Steve's treatment during his first night in the hospital; (4) the failure of the nursing staff to carry out Dr. Fresh's orders; (5) Dr. Fresh's failure to supervise the nurses; and (6) Dr. Fresh's failure to perform emergency surgery after his initial examination of Steve. At the close of the evidence the district court granted defendants' motion for a directed verdict. In his memorandum order and opinion the court held that plaintiffs had failed to establish defendants' negligence or show that Steve's condition was proximately caused by the defendants.

In reviewing the district court's directed verdict for defendants, we must consider all of the evidence in the light most favorable to the plaintiffs. Unless there is "substantial evidence" opposed to the motions such that reasonable persons might reach different conclusions, the district court's verdict must be affirmed. *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). To determine whether sufficient evidence was adduced at trial to overturn a directed verdict,[4] we must first ascertain what evidence the plaintiffs were required to present under Georgia malpractice law.

Georgia Code Ann. § 84–924 requires a physician to exercise "a reasonable degree of care and skill." This standard has been elaborated by the Georgia courts. In a malpractice action a doctor is held to a standard of care that, "under similar conditions and like circumstances, is ordinarily employed by the medical profession generally." *Kenney v. Piedmont Hospital*, 136 Ga.App. 660, 222 S.E.2d 162, 167 (1975). *Cf.*

*Murphy v. Little*, 112 Ga.App. 517, 145 S.E.2d 760, 763–64 (1965) (standard of care not limited to locality or community). Such standard is ordinarily established through the testimony of expert witnesses. *Shea v. Phillips*, 213 Ga. 269, 98 S.E.2d 552, 555 (1957); *Kenney, supra* at 167. Testimony showing a mere difference in views or individual practices among doctors, however, is insufficient to support a malpractice action where it is shown that each view or practice is acceptable and customary. *Hayes v. Brown*, 108 Ga.App. 360, 133 S.E.2d 102, 106–07 (1963). *See also Mayo v. McClung*, 83 Ga.App. 548, 64 S.E.2d 330, 335 (1951) ("It was not a question of what one individual doctor thought was advisable."). Additionally, there is a presumption that medical services were performed in an ordinary, skillful manner, and the burden is on the plaintiff to show a failure to exercise due care. *Shea, supra* at 554; *Kenney, supra* at 167. *See also Watson v. United States*, 346 F.2d 52, 53 (5th Cir. 1965), *cert. denied*, 382 U.S. 976, 86 S.Ct. 544, 15 L.Ed.2d 467 (1966). To prevail, plaintiff must show not only that the defendant was negligent but also that plaintiff's injury was proximately caused by the defendant's lack of care or skill. *Parrott v. Chatham County Hospital Authority*, 145 Ga.App. 113, 243 S.E.2d 269, 270–71 (1978).

Turning to the testimony presented at trial, we find the record lacking in evidence sufficient to prevent a directed verdict for defendants. Plaintiffs' principal contention on appeal is that defendants violated the standards "ordinarily employed by the profession generally" by failing to take an angiogram or perform emergency surgery on a person in Steve Robertson's condition when he was first examined by Dr. Fresh.[5]

---

4. Under *Boeing*, we must consider all the evidence, not just that evidence that supports the nonmovers' case. 411 F.2d at 374, 375 n. 16.

5. At oral argument, plaintiffs' counsel conceded that the failure, if any, of the nursing staff to carry out Dr. Fresh's order to perform hourly neurochecks was "irrelevant" because Dr. Tindall admittedly found Steve in the same condi-

tion at 7 a. m. as he was when Dr. Fresh examined him at 3:30 a. m. Given this concession, it necessarily follows that Dr. Fresh's alleged failure to supervise Steve's treatment during Steve's first night in the hospital and Dr. Fresh's alleged failure to supervise the nurses are also "irrelevant" to the issue of defendants' negligence.

Other than Drs. Fresh and Tindall,[6] plaintiffs' only expert witness was Dr. Keith Langford,[7] Associate Professor of Neurosurgery at the University of Alabama. Although Dr. Langford is an advocate of early surgical exploration of subdural hematomas, he repeatedly refused to criticize the defendants' handling of Steve Robertson "without personal knowledge of the events." In fact, Dr. Langford testified that he was not "prepared to say that normal practice is different" from the course of treatment followed by Drs. Tindall and Fresh. Dr. Langford's testimony thus supported *defendants'* position, not plaintiffs'.

Similarly, none of the other doctors who testified indicated that standard practice was other than that carried out by defendants. Defendants' expert, Dr. Robert McLaurin, Chairman of the Division of Neurosurgery at the University of Cincinnati, testified that it was "the normal process" to continue observation, not to perform emergency angiography or emergency surgery, even assuming Steve had deteriorated to the extent represented by the discrepancies between Dr. Coleman's findings and Dr. Fresh's.[8] He concluded that Steve had "received very excellent care, and certainly in my judgment it would be entirely in keeping with standards of care in my own community and in the neurosurgical community in this country." Dr. Tindall testified that it was "normal practice to stay on top of the evaluation observation" of a patient with a serious head injury, adding that Dr. Fresh's management of the patient during the early morning hours was "appropriate." There was some expert testimony concerning situations in which emergency angiography or emergency surgery would be standard medical practice, but none of these were present in the instant case.[9] In sum, plaintiffs have not overcome the presumption of due care or demonstrated that defendants did not follow standard medical procedures in failing to take an angiogram or perform emergency surgery on Steve at the time he was first examined by Dr. Fresh.

Plaintiffs also contend that Dr. Fresh's failure to report the differences between his findings and Dr. Coleman's to Dr. Tindall constitutes actionable negligence. There was no expert testimony, however, to the effect that Dr. Fresh was negligent in failing to attach more significance than he did to Dr. Coleman's findings.[10] Moreover, the difference in the findings were not simply missed or ignored. Dr. Fresh and Dr. Coleman testified that they had discussed the differences and had concluded that Dr. Coleman had simply overlooked the weaknesses on Steve's right side. Apparently

---

**6.** Plaintiffs called Dr. Fresh and Dr. Tindall as adverse witnesses under Fed.R.Civ.P. 43(b).

**7.** Dr. Langford did not actually testify at trial. His videotaped deposition was shown to the jury.

**8.** *See* n. 10 and accompanying text *infra.*

**9.** For example, Dr. Tindall testified that it would be normal medical practice" to order an angiogram on an emergency basis if a patient deteriorated from a "grade 1 plus" coma to a "grade 2" coma on a scale of comas devised by Dr. Tindall himself. Despite allegations of deterioration, however, there was no testimony whatsoever that Steve deteriorated to a "grade 2" condition at any time. Dr. Tindall also testified that "in over fifty percent of the cases of diagnosed subdural hematomas where it is verified," he would operate. In the instant case, the diagnosis was never verified. Finally, Dr. McLaurin testified that "when the diagnosis [is] an insignificant subdural hematoma but an incipiently dangerous edema situation, normal medical practice for treating the hematome would be surgical removal." There is no evidence that this was the diagnosis here.

**10.** The neurosurgeons who testified at trial agreed that the development of weaknesses should give one pause to reconsider initial impressions but differed about the importance to attribute to it. Drs. McLaurin and Tindall consider the development of weaknesses purportedly evidenced by the discrepancies in the findings of relatively little significance; Dr. Fresh considers it of some significance; and Dr. Langford considers it of somewhat greater significance. But even Dr. Langford testified that the assessment of any one clinical sign is a judgment question that depends upon the totality of the circumstances; for this reason he was unwilling to say that his own choice of treatment would have been different, much less that the defendants' choice of treatment deviated from normal medical practice.

Dr. Fresh had been informed by Frank Robertson that Steve had a problem with his right hand and with slurred speech when Steve first returned home at around 9 p. m. Based on the similarity of Mr. Robertson's observations to his own findings, Dr. Fresh reasoned that the situation he found at 3 a. m. "was the identical situation that the father had found some six hours earlier." Plaintiffs have failed to demonstrate that Dr. Fresh's conduct was negligent in this regard.

■ The plaintiffs argue that certain statements made by Dr. Tindall to Frank Robertson a day or two after the operation [11] constitute "an admission of liability," and were entitled to be treated as such by the jury. Interpreted in the light most favorable to the plaintiffs, the statements can be read as admissions. The question here, however, is not the admissibility of the statements but their weight—more specifically, whether the statements, considered in light of all the evidence, are of sufficient probative value to raise a jury question on negligence. They are not. Not only are the statements as plaintiffs would construe them not corroborated by the medical evidence, but their most obvious explanation does not support the plaintiffs' theories. The most reasonable interpretation of Dr. Tindall's statement that he could not "afford to bore holes in everybody's

head they bring in here" is as a statement of the undisputed medical fact that brain surgery is not indicated for every patient who has suffered a serious head injury. In his statement that Drs. O'Brien and Fresh "botched it up," Dr. Tindall was almost certainly referring to the 11 a. m. surgery performed by Drs. O'Brien and Fresh, with respect to which the plaintiffs did not allege negligence, because Dr. O'Brien did not even see Steve prior to that operation. In any event, there was no evidence presented that either doctor was negligent. Finally, there was no expert testimony supporting Dr. Tindall's statement that performing the operation at an earlier time would have "saved the boy." In fact, all of the expert testimony indicated the contrary.[12] Thus, in light of the overwhelming evidence to the contrary, the "admissions" by Dr. Tindall were not sufficient to take this case to the jury.

Given plaintiffs' failure to present "substantial evidence" of defendants' negligence,[13] we affirm the directed verdict for defendants.

AFFIRMED.

---

11. During the direct examination of Frank Robertson the following colloquy ensured:

Q [by plaintiffs' attorney]: Just say what you told him.

A [by Mr. Frank Robertson]: What I told Dr. Tindall?

Q Yes, sir. Your exact words.

A I told him that Dr. Corsour told me that *a couple of boreholes would have saved the boy.* I asked him what that was, and he said boring a couple of holes through the skull to let the blood out and relieve the pressure.

Q What did he say?

A *He said that was true, but he said, "Hell, Boy, I can't afford to bore holes in everybody's head they bring in here."*

Q What was your response to that?

A. Well, I don't know. We talked on there about something. I admit I got pretty hot. *He told me, he says, "You ought to go after

*O'Brien and Fresh. They was [sic] the ones that botched it up anyhow."* (Emphasis added.)

12. Dr. Fresh testified that edema, rather than subdural hematoma, was Steve's primary problem and that had he been operated on at 3:30 a. m. his present condition would not have been any different. Similarly, Dr. McLaurin testified that removal of the subdural hematomas at an earlier time would not have changed the ultimate outcome. Dr. O'Brien agreed. Dr. Langford, in refusing to say that defendants were negligent, opined that Steve had only a 50/50 chance of survival after his initial injury.

13. We need not reach the issue of proximate cause. However, we note in passing that plaintiffs failed to show a "reasonable degree of medical certainty," *Parrott,* 243 S.E.2d at 270, that defendants' negligence was the proximate cause of Steve's condition. The trial court's finding to this effect was undoubtedly correct.