These appeals restate the issues decided in *Colony Square.*

We hold that the district court properly enjoined Colony Square from commencing or continuing reorganization proceedings affecting the Colony Square property, from seeking to cite Prudential or its legal counsel for contempt, or from otherwise taking any action against Prudential and its counsel for proceeding in the Atlanta bankruptcy court. We also hold that the Atlanta bankruptcy court properly dismissed the Chapter 11 case transferred from the Pittsburgh district court.

We affirm the district court in both cases.

AFFIRMED.

Katie Laurel **WELLS, et al.,**
**Plaintiffs-Appellees,**

v.

**ORTHO PHARMACEUTICAL CORPORATION, Defendant-Appellant.**

No. 85–8683.

United States Court of Appeals,
Eleventh Circuit.

May 6, 1986.

Rehearing and Rehearing En Banc
Denied June 27, 1986.

Robert L. Pennington, Atlanta, Ga., Barry L. Shapiro, Marc S. Klein, Newark, N.J., for defendant-appellant.

James C. Simmons, Jr., Atlanta, Ga., for plaintiffs-appellees.

Before GODBOLD, Chief Judge, VANCE, Circuit Judge, and THOMAS *, Senior District Judge.

VANCE, Circuit Judge:

Defendant Ortho Pharmaceutical Corporation ("Ortho") appeals a $5.1 million judgment in favor of plaintiffs Katie Laurel Wells, an infant, Mary Maihafer, her mother, and Gary Wells, her father, under theories of negligent failure to warn and strict liability. The case concerns a spermicide manufactured by Ortho that allegedly caused Katie Wells to be born with birth defects. After reviewing the extensive factual record we affirm with respect to Ortho's liability but modify the amount of damages.

## I. *Factual Background*

Katie Laurel Wells was born on July 1, 1981 with birth defects including deformity of her right hand, the complete lack of a left arm with only partial development of her left clavicle and shoulder, a cleft lip, and nostril deformity. A later diagnosis showed that she also has an optic nerve defect in her right eye. The plaintiffs alleged that these birth defects were caused by a spermicidal jelly used by the mother for approximately four weeks after conception until she discovered that she was preg-

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

nant.[1] The spermicidal jelly used by Mary Maihafer, in conjunction with a diaphragm, was manufactured and marketed without a prescription by Ortho. Called Ortho-Gynol Contraceptive Jelly ("Ortho-Gynol"), this vaginal spermicide has as its active ingredient a non-ionic surfactant known as Octoxynol-9.[2] The Ortho-Gynol label and package insert in 1980 contained only this warning—the spermicide might cause irritation to the female or male genitalia, is not 100 percent effective, and should be kept out of the reach of children.

Plaintiffs brought suit against Ortho alleging that Ortho-Gynol caused Katie Wells' birth defects, that Ortho negligently failed to warn that its spermicide could cause serious birth defects, and that Ortho's failure to warn proximately caused the birth defects. Plaintiffs sought damages for Katie Wells' pain and suffering, medical expenses and disability, as well as Mary Maihafer's emotional distress and lost wages. The parties waived a jury, and the district court tried the case from January 1 through January 22, 1985. The district court found that plaintiffs had proven to a reasonable degree of medical certainty that the birth defects of Katie Wells' left arm and shoulder and her right hand were proximately caused by Ortho's product, but found otherwise with respect to her cleft lip, nostril deformity and right optic nerve defect. The district court also found that Ortho knew or should have known that its product might cause birth defects. Damages were awarded exceeding $5.1 million.[3] Ortho later moved to reopen the trial for the consideration of two new scientific studies, but the district court denied this motion.

1. Mary Maihafer obtained the spermicidal jelly and a diaphragm from her physician in July 1980 and used them every time she engaged in sexual intercourse with Gary Wells until the middle of November 1980.

2. A non-ionic surfactant spermicide works by breaking down the sperm cell membrane.

3. The district court broke down the damage award as follows:

## II. Discussion

In this appeal we must examine the district court's factual findings under the clearly erroneous standard. In our review we are guided by Anderson v. City of Bessemer City, — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), in which the Supreme Court stated:

"In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

Anderson, — U.S. at —, 105 S.Ct. at 1511–12.

### A. Causation

█ Defendant Ortho argues that plaintiffs failed to prove causation to a reasonable degree of medical certainty. See Robertson v. Emory University Hospital, 611 F.2d 604, 608 n. 13 (5th Cir.1980); Parrott v. Chatham County Hospital Authority, 145 Ga.App. 113, 243 S.E.2d 269, 270 (1978). Ortho asserts that the district court made a clearly erroneous finding of fact concern-

(1) Katie Wells:
| | | |
|---|---|---|
| (a) loss of future earnings | | $415,000 |
| (b) future medical expenses | | $1,200,000 |
| (c) past and future pain and suffering | | $3,000,000 |

(2) Mary Maihafer:
| | | |
|---|---|---|
| (a) medical expenses of Katie Wells | | $30 |
| (b) loss of earnings | | $36,000 |
| (c) mental distress | | $500,000 |

ing causation and that this finding derives from a clearly erroneous fact-finding methodology. Ortho complains that despite the inconclusive nature of the scientific and medical studies introduced, the district court erroneously held that plaintiffs carried their burden of proof regarding causation. Ortho argues that the district court's findings based on the oral testimony of plaintiffs' experts should be set aside because those findings are not based on opinions with scientifically reliable foundations. In Ortho's estimation plaintiffs failed to focus sufficiently on epidemiology—the field of science dealing with the relationships of the various factors which determine the frequencies and distributions of certain conditions and diseases in human populations.[4] Ortho asserts that epidemiological studies should be relied on to provide the essential data to formulate an opinion on causation. Ortho also challenges the district court's credibility choices in analyzing both sides' experts.

■ After reviewing the record we reject Ortho's arguments and conclude that the district court's finding of causation is not clearly erroneous. We note that plaintiffs presented well qualified experts who testified at length concerning causation.[5] These experts relied on their particular areas of expertise, their personal examinations of the child (at least by Dr. Buehler and Dr. Sutherland), and medical and scientific studies relative to causation to conclude that Ortho-Gynol caused Katie Wells' birth defects. Plaintiffs presented several epidemiological studies that indicated an association between spermicide use and deleterious effects on the fetus.[6] Plaintiffs noted various studies relative to absorption suggesting that absorption of the spermicide by the mother produced vascular disruption in the fetus that led to the birth

**4.** Ortho further argues that while plaintiffs' experts did rely on a few epidemiological studies that suggested a causal hypothesis, the inability of later studies to replicate the results of those studies negates the hypothesis.

**5.** Plaintiffs' principal experts concerning causation were Dr. Bruce Buehler, Dr. Earl Sutherland, and Dr. John Holbrook. Dr. Buehler is the director of the Center for Human Genetics and director of the Meyer Children's Rehabilitation Institute in Omaha, Nebraska. Dr. Buehler's research area is biochemical teratology, the study of the effects of drugs or environmental agents on developing fetuses. He is board-certified in clinical genetics, pediatrics, and biochemical and metabolic genetics. Dr. Sutherland is a licensed physician with a Ph.D. in pharmacology. He is board-certified in internal medicine and has served since 1980 as the medical director of the Rocky Mountain Drug Consultation Center, which disseminates medical and pharmacological information to consumers and health professionals. Dr. Holbrook is the director of research and associate professor at Mercer University Southern School of Pharmacy in Atlanta, Georgia. He has a B.S. degree in pharmacy and a Ph.D. in pharmacology and has done extensive research on the toxic effects of drugs on various animal species.

**6.** The epidemiological studies principally relied on by plaintiffs and plaintiffs' experts are as follows:
(1) Oechsli, Studies of the Consequences of Contraceptive Failure (Apr. 8, 1976) (unpublished study). According to Dr. Bueh-

ler, this study indicated a question and possible relationship between spermicides and birth defects. Frank W. Oechsli, Ph.D., of the School of Public Health at the University of California, Berkeley, produced the study for the Contraceptive Evaluation Branch, Center for Population Research, National Institute of Child Health and Development. A later published study by Harlap in 1980 cited the Oechsli study, though the Harlap article disagreed with it.
(2) Smith, Dafoe, Miller & Banister, *An Epidemiological Study of Congenital Reduction Deformities of the Limbs*, 31 Brit.J. Preventive & Soc.Med. 39 (1977). Dr. Buehler noted that the Smith article drew no strong conclusions but contained data suggesting an association between spermicides and limb deficiencies.
(3) Jick, Walker, Rothman, Hunter, Holmes, Watkins, D'Ewart, Danforth & Madsen, *Vaginal Spermicides and Congenital Disorders*, 245 J. A.M.A. 1329 (1981). Dr. Buehler testified that the Jick article raised a serious question about an association between spermicides and limb defects.
(4) Buttar, *Assessment of the Embryotoxic and Teratogenic Potential of Nonoxynol-9 in Rats Upon Vaginal Administration*, 2 Toxicologist 39 (1982). Dr. Buehler noted that the Buttar study demonstrated that spermicides caused increased numbers of fetuses to be reabsorbed in rats and in mice, suggesting that spermicides can reach the fetus and destroy it.

defects.[7] The district court turned to the oral testimony of the various expert witnesses to resolve conflicts in the studies presented by each side. The court stated that it "found the studies to be inconclusive on the ultimate issue of whether the Product caused Katie Wells' birth defects." In facing this "battle of the experts," the district court was thus forced to make credibility determinations to "decide the victor." [8] *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

We recognize, as did the *Ferebee* court, that

a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical.

*Id.* at 1535–36. The district court properly noted that "its ultimate focus was *the birth defects suffered by Katie Wells.* Plaintiffs' burden of proving that Katie Wells' defects were caused by the Product did not necessarily require them to produce scientific studies showing a statistically significant association between spermicides and congenital malformations in a large population." As the D.C. circuit noted in *Ferebee,* a distinction exists between legal

sufficiency and scientific certainty. *Id.* at 1536. If the factfinder here is convinced that plaintiffs have proven to a reasonable degree of medical certainty, which is the legal standard employed in this case, that Ortho-Gynol caused Katie Wells' arm, shoulder and hand defects, it does not matter in terms of deciding the case that the medical community might require more research and evidence before conclusively resolving the question. What matters is that this particular factfinder found sufficient evidence of causation in a legal sense in this particular case, and that that finding is not clearly erroneous.

## B. *Failure to Warn*

■ Ortho next argues that the district court's liability finding based on Ortho's negligent failure to warn is clearly erroneous. Ortho contends that the district court misinterpreted Georgia law on the duty to warn, that the court's finding lacks substantial evidence in the record, and that the court improperly failed to consider two FDA review panels' determinations that no warning is necessary for non-ionic surfactant spermicides. We reject Ortho's arguments and conclude that the district court's finding concerning Ortho's negligent failure to warn is not clearly erroneous.

Georgia law states that a manufacturer has a duty to warn of non-obvious foreseeable dangers from the normal use of its product. *Rhodes v. Interstate Battery System, Inc.*, 722 F.2d 1517, 1519 (11th Cir.1984); *Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 740 n. 4 (5th Cir.1980). If a manufacturer has actual or constructive knowledge of potential dangers of a product, the manufacturer must warn pur-

---

**7.** The absorption studies principally relied on by plaintiffs and plaintiffs' experts are as follows:
   (1) Buttar, *Transvaginal Absorption and Disposition of Nonoxynol-9 in Gravid Rats,* 13 Toxicology Letters 211 (1982).
   (2) Chvapil, Eskelson, Stiffel, Owen & Droegenmueller, *Studies on Nonoxynol-9. II. Intravaginal Absorption, Distribution, Metabolism and Excretion in Rats and Rabbits,* 22 Contraception 325 (1980).

**8.** We are satisfied that the district court's extensive credibility determinations are not clearly

erroneous. In assessing credibility the court looked at each expert's background, training, experience, and familiarity with the circumstances of this particular case. The court examined each expert's testimony in terms of its rationality and internal consistency in relation to all the evidence presented. The court also looked at each expert's demeanor and tone and searched for motives, biases, and interests that might have influenced opinion.

chasers at the time of sale and delivery. *Id.; Beam v. Omark Industries, Inc.,* 143 Ga.App. 142, 237 S.E.2d 607, 610 (1977). Properly applying Georgia law, the district court found that prior to July 1980 when Mary Maihafer purchased Ortho-Gynol, Ortho had actual or constructive knowledge that Ortho-Gynol might cause birth defects and thus was under a duty to warn purchasers, including Ms. Maihafer, of this risk. We conclude that this finding is not clearly erroneous in light of the evidence present in the record. Several studies existed prior to 1980 indicating that the use of spermicides might cause an increased risk of birth defects.[9] The district court found, and we agree, that these studies were available to Ortho. Plaintiffs' experts presented credible testimony that a warning was necessary, that the duty to warn arose prior to Mary Maihafer's purchase of the product, and that the failure to warn proximately caused Katie Wells' birth defects.[10] The warning present on the Ortho-Gynol label and package insert at the time Mary Maihafer bought the product clearly did not mention the risk of birth defects.

The district court did consider the two FDA reports concerning non-ionic surfactant spermicides. The court, however, was not required to accept them as conclusive. An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes. *See Ferebee,* 736 F.2d at 1540. As we have stated previously, "compliance with regulatory standards may be admissible on the issue of care but does not require a jury [or judge as factfinder] to find a defendant's conduct reasonable." *Dorsey v. Honda Motor Co.,* 655 F.2d 650, 656 (5th Cir. Unit B 1981), *modified on other grounds,* 670 F.2d 21 (5th Cir. Unit B), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). We affirm the district court's findings concerning Ortho's negligent failure to warn.

### C. *Damages*

Ortho asserts that the district court's determination of damages is clearly erroneous in that the court improperly awarded damages to Mary Maihafer for her emotional injuries. Ortho also argues that the court made a duplicative award of damages to Katie Wells for future lost earnings based on her total disability while at the same time making an award of damages to cure that total disability. We do not agree with Ortho's contention concerning Mary Maihafer's emotional injuries, but we conclude that the damage award to Katie Wells must be modified in light of the duplicative nature of part of it.

The district court awarded Katie Wells $415,000 in damages for loss of future earnings. 615 F.Supp. 262. The court based this award on the testimony of plaintiffs' experts Dr. Joseph Bussey and Dr. John Brown.[11] Dr. Bussey testified that "the impairments that [Katie Wells] has do constitute total and permanent disability for rating purposes." Dr. Brown analyzed Katie Wells' loss of future earnings from an economic perspective and stated that he was "assuming a hundred percent disability for purposes of [his] report." The court noted that Dr. Brown had produced a figure similar to the $415,000 award based on the assumption that Katie Wells would

9. The three studies suggesting an association between spermicides and increased risk of birth defects prior to 1980 were the 1976 Oechsli study and the 1977 Smith study, *see supra* note 6, and a 1975 study, *Vaginal Contraceptives—A Time for Reappraisal?,* Population Reports, Jan. 1975, at H–37.

10. Plaintiffs' experts' Dr. Sutherland and Dr. Holbrook, *see supra* note 5, and Dr. Dick Gourley testified that Ortho should have warned of the risk of birth defects prior to 1980. Dr. Gourley is the dean of Mercer University School of Pharmacy in Atlanta, Georgia, and has published extensively on topics relating to pharmacy.

11. Dr. Bussey is a general surgeon who formerly served as a consultant to a division of Johnson and Johnson, Ortho's parent company. Dr. Brown is an economist specializing as an actuary who serves as assistant professor of actuarial science at Georgia State University in Atlanta, Georgia.

have completed college, that her "work life expectancy" would have been 27.91 years, and that she is totally disabled. In the court's estimation, the fact that Ortho had been found liable only for the defects of Katie Wells' left arm and shoulder and right hand would be offset by the court's finding that Katie Wells' "work life expectancy" likely would have been longer than Dr. Brown's conservative estimate of 27.91 years given her intelligence and her mother's educational achievements. The district court also awarded Katie Wells $1.2 million for future medical expenses associated with the birth defects proximately caused by Ortho-Gynol. The court based this award on "Dr. Buehler's testimony concerning Katie Wells' future medical expenses, including regular replacement of prosthetic devices and modification of work and living space." Finally, the court noted in a footnote to its order that it was including damages for loss of earning capacity in the court's $3 million award to Katie Wells for pain and suffering.

We conclude that the $415,000 award to Katie Wells was duplicative and clearly erroneous for the following reasons. Though the court's order is somewhat vague concerning damages it is apparent that in making the award for loss of future earnings the court was assuming Katie Wells' total disability because both experts relied on by the court, Dr. Bussey and Dr. Brown, made that assumption. A conflict arises, however, when one considers that the court then made a further award to Katie Wells for future medical expenses including damages for the outfitting of Katie Wells with prosthetic devices and the modification of work space so she could actually work. Dr. Buehler, experienced in rehabilitation medicine, indicated in his testimony that "based on my physical examination, even with that eye being, at least by the report, abnormal in vision, with her intelligence and the use of two arms and all, she could probably go up to the point of doing very, very important work with her arms, and she could have a very open career." Con-

sidering equipping her with prosthetic devices and training her to use a series of prostheses called myoelectrics, electrical-stimulated devices, Dr. Buehler testified that "we could pretty much return her to the potential of almost any occupation." Dr. Bussey also suggested that with prosthetics Katie Wells likely could develop skills sufficient to be employable. We conclude that an award for loss of future earnings based on Katie Wells' total disability is duplicative in that it conflicts with an award for future medical expenses designed to make her employable and a further general damages award for loss of earning capacity included in the pain and suffering award. The testimony of Dr. Buehler and Dr. Bussey indicates that Katie Wells would be employable if she is equipped with prosthetic devices and sufficiently trained to use them, and we therefore modify the damage award to Katie Wells by reducing it by $415,000, striking the award for loss of future earnings. *See Quality Foods, Inc. v. U.S. Fire Insurance Co.*, 715 F.2d 539, 543 (11th Cir.1983) (recognizing our authority to reduce a judgment); *see also Simpson v. United States*, 322 F.2d 688, 693 (5th Cir.1963) ("[w]here there are firm guidelines establishing the basic elements of the award and it can be computed with some degree of certainty as easily by the appellate court as by the trial judge, it would be mere wasted motion to remand the cause for new findings"). The judgment is thus reduced to the following amounts:

(1) Katie Wells:
    (a) future medical expenses     $1,200,000
    (b) past and future pain and     $3,000,000
        suffering

(2) Mary Maihafer:
    (a) medical expenses of Katie Wells     $30
    (b) loss of earnings     $36,000
    (c) mental distress     $500,000

The case is remanded to the district court for entry of judgment in the amount of $4,736,030 in favor of plaintiffs.[12] AF-

---

12. Ortho also appeals the district court's denial of Ortho's motion to reopen the trial to consider

two recent studies concerning the relationship between spermicides and birth defects. We

FIRMED and MODIFIED in part, RE-MANDED with instructions.

---

note that decisions concerning reopening of a direct case at trial are within the sound discretion of the district court. *United States v. One 1972 44' Striker, Bonanza,* 753 F.2d 867, 869 (11th Cir.1985). We discern no abuse of that discretion in this case.