62202. GRAGG et al. v. SPENSER.

POPE, Judge.
This is the second appeal from a medical malpractice action brought by Mr. and Mrs. Gragg for damages allegedly occurring when an angiogram was performed upon Mr. Gragg. The events leading up to this litigation, as set forth in *Gragg v. Neurological Associates,* 152 Ga. App. 586 (263 SE2d 496) (1979), were as follows:

"After experiencing severe headaches, difficulty in walking, and a trembling seizure, Mr. Gragg visited Dr. Peter Reitt. Dr. Reitt's initial diagnosis was uncertain, and he recommended conducting an angiogram upon Gragg at Crawford W. Long Hospital. The procedure entails insertion of a catheter into each of the two carotid arteries, which supply blood to the brain. The catheter first is inserted into the femoral artery, located in the groin region, and then is carefully moved up through the vascular system to the left carotid artery. A contrast material is injected into the left artery, and later into the right, and X-rays are obtained which would indicate whether there is any blockage or occlusion present.

"X-rays were successfully taken of Gragg's left carotid artery, but Dr. Reitt encountered difficulty in endeavoring to maneuver the catheter from the left to the right carotid artery. Not wishing to

abandon the test or attempt to utilize the alternative, riskier method, which is to puncture directly into the artery through the neck, Dr. Reitt summoned appellee, Dr. Spenser, who was present in the hospital but not in the operating room . . .

"Dr. Reitt had performed, prior to this occasion, approximately three hundred angiograms. A slight risk of stroke always accompanies the procedure. Dr. Spenser was a specialist in the test, and he responded to Dr. Reitt's request for aid. In about three minutes, with Dr. Reitt at his side Dr. Spenser succeeded manipulating the catheter into the desired position, 'with a little difficulty.' He then departed from the operating room. The two doctors had been co-residents for years and quite often consulted with one another on cases.

"Fifteen minutes after completion of the angiogram, Mr. Gragg suffered a stroke. The attack left him with permanent total paralysis of the left arm and hip and with permanent partial loss of the use of the left arm and hand." Id. at 586-87.

In the prior appearance of this case we reversed the summary judgment granted to appellee Spenser solely on the basis of the Good Samaritan Statute (Code Ann. § 84-930), holding that "as a matter of law, the hardship encountered here during the progress of the diagnostic procedure being conducted by an experienced physician did not constitute such an accident or emergency as would invoke the provisions of the Good Samaritan Statute" Id. at 588.

After reversal additional discovery was conducted and Dr. Spenser filed a second motion for summary judgment. Following a hearing a partial summary judgment was granted in favor of Dr. Spenser as to the claim of negligence against him but denied as to a count alleging that Dr. Spenser's performance of the medical procedure upon Mr. Gragg without his consent constituted a battery and trespass. This appeal is from that order.

Summary judgment was granted based upon Dr. Spenser's own affidavit as an expert that he had not negligently performed his medical duties. Under present case law, this is a sufficient expert opinion to establish grounds for summary judgment in a malpractice action unless the plaintiff-patient refutes such testimony by an expert opinion that the defendant's treatment was not reasonable under the circumstances. *Payne v. Golden,* 245 Ga. 784 (267 SE2d 211) (1980); *Parker v. Knight,* 245 Ga. 782 (267 SE2d 222) (1980). Appellants contend that Dr. Spenser's affidavit was conclusory and vague, containing almost no factual detail, and that a question of fact as to actionable negligence was raised by competent medical testimony and other evidence conflicting with Dr. Spenser's affidavit.

In his affidavit Dr. Spenser stated that he "manipulated the catheter in question into the desired location. Within a minute or so of entering the operating room I had finished the manipulation and turned the procedure back to Dr. Reitt. I did not see the patient again thereafter ... At all times relevant to my care of the patient, including but not limited to the initial evaluation of the situation and manipulation of the catheter, I exercised that degree of care and skill which was customarily and ordinarily employed by physicians of my specialty not locally but generally in 1974 when confronted with the same signs and symptoms presented by this patient. Specifically, at all times I exercised a reasonable and competent degree of medical care and skill on the patient's behalf, and at no time did I depart from a reasonable and competent degree of care and skill in my treatment of this patient."

Mr. Gragg testified that immediately after Dr. Spenser took over manipulation of the catheter he felt a "terrific pain" in his head and became unconscious. Indications that Mr. Gragg had suffered a stroke became apparent to the attending nurses about 12:30 p.m., shortly after Mr. Gragg was taken from the room in which the procedure had been administered; however, neither Dr. Spenser nor Dr. Reitt had given treatment instructions for Mr. Gragg and it was not until 3 p.m. that a staff physician saw him. Dr. Reitt did not see his patient until later that day. Dr. Spenser did not see him at all, although he learned of his stroke the next day.

Testimony was given by Dr. James C. Hoffman, Jr., an associate professor of radiology and a director of neuroradiology at Emory University School of Medicine, concerning the importance of monitoring a patient's condition during an angiogram so as to avoid delay in treating possible complications. Dr. Hoffman expressed the opinion that it "would be relevant to know" if the patient, "after an injection in a vessel, was unconscious," and that there were certain "specifications" that should be taken in immediate response to loss of consciousness. Dr. Hoffman explained that when an angiogram was completed, the physician would normally "pull the catheter out, hold pressure, talk to the patient and say, 'How do you feel?' And if they are feeling okay, we move them out on a stretcher. You can see when you are moving them on a stretcher if they are moving everything. So it is pretty obvious to you that they have no side effects at that time." If evidence of side effects is apparent, "we immediately take their blood pressure. We [may] start intravenous fluids on them and we will ask for a neurology or a neurosurgery consult.

"As a radiologist, I work on a referral basis from other physicians. We do what we think is necessary to take care of the patient at that time and then call the patient's physician and ask him

what he would like for us to do. He may either come see the patient or have some other consultant see the patient . . ." In Dr. Hoffman's opinion, it was "not normal" for a patient to leave the room unconscious after this procedure. "Certainly that could be a complication from the angiogram. The patient could have gotten hypotensive from the studies which they do . . . If the patient was not talking to me and came into the room talking, I would be very concerned . . . [and] would look into it and wouldn't just leave . . . " Dr. Spenser admitted in his deposition that he did not examine or monitor Mr. Gragg's condition before, during or after he participated in administering the angiogram.

Appellee argues that Dr. Hoffman's testimony also contained some opinion evidence that Dr. Spenser performed the angiogram with due skill and care, and that the statements which could be construed as critical of the arteriogram technique are legally insufficient to create any fact issue. We do not agree. The crux of appellants' position is that Dr. Spenser negligently performed the procedure when he failed to monitor the patient's condition or to follow up afterwards so that any injuries induced by the angiogram could be detected and promptly treated.

Even recognizing that Dr. Spenser's specialty in the field of neuroradiology is primarily as a diagnostic rather than as a treating physician, we think that when Dr. Spenser's testimony as to his conduct is compared to the standards presented by Dr. Hoffman, several material questions of fact as to negligence are raised, to wit: (1) Once Dr. Spenser took over the performance of the medical procedure for a brief period of time without the patient's consent, did he owe this patient the same duty that any other treating physician would have owed his patient? (2) If so, was he negligent in failing to monitor the patient's condition? (3) Did Mr. Gragg become unconscious during Dr. Spenser's performance of the angiogram, and if so, was Dr. Spenser negligent in failing to detect this loss of consciousness? (4) Was Dr. Spenser negligent in failing to follow the progress of the patient or to notify hospital officials that he had been involved in performing the procedure so that he could have been summoned when Mr. Gragg's stroke was discovered and Dr. Reitt was unavailable? These are questions that can only be answered by a jury. Compare *Skinner v. Coleman-Nincic Urology Clinic,* 156 Ga. App. 638 (1) (257 SE2d 724) (1980).

The nonparty physician need not specifically opine that the defendant was negligent, for "such explicit conclusory pronouncements out of the mouths of those clothed with the mantle of evidentiary expertise are not essential. 'While the witnesses in the present case did not testify using the words "the defendant was guilty

of malpractice" the testimony given was sufficient to authorize [a] jury to find that the defendant had in fact failed to use "due care, skill and diligence" in treating the plaintiff. Accordingly, the trial court erred in [granting summary judgment] for the defendant . . .' *Wilson v. Kornegay,* 108 Ga. App. 318, 321 (132 SE2d 791) (1963)." *Lawrence v. Gardner,* 154 Ga. App. 722, 724 (270 SE2d 9) (1980). Accord, *Leagan v. Levine,* 158 Ga. App. 293 (1) (279 SE2d 741) (1981). For these reasons the trial court's order granting Dr. Spenser's motion for partial summary judgment as to negligence must be reversed, and this issue tried before the jury.

*Judgment reversed. Quillian, C. J., and McMurray, P. J., concur.*

DECIDED SEPTEMBER 11, 1981.

*Jerry L. Sims,* for appellants.
*Robert Tanner,* for appellee.