65944. SIMPSON et al. v. DICKSON.

POPE, Judge.

Merle D. Simpson and her husband Edgar brought this action alleging medical malpractice against Dr. William A. Dickson. Mrs. Simpson sought to recover damages based essentially on (1) Dr. Dickson's alleged negligence in failing to warn her as to the possible risks of the surgery he performed on her and (2) Dr. Dickson's alleged negligence in performing the surgery. Mr. Simpson sought damages for loss of consortium. Dr. Dickson moved for summary judgment which, following further pretrial discovery, was granted by the trial court. The Simpsons appeal.

The facts in this case are essentially without dispute. In early

June 1980 Mrs. Simpson consulted with Dr. Dickson concerning a lymph node in her neck which had become tender and irritated. Following the consultation, the determination was made to surgically remove the node from the left side of her neck. On June 10, 1980 Mrs. Simpson was admitted to Smith Hospital in Hahira, Georgia for removal of the node. She executed a form entitled "Consent to Treatment," authorizing and consenting "to such treatment, including, but not limited to, surgical operations, anesthesia (either local or general) and x-ray examination or treatment as may be ordered or requested by the doctor . . . in connection with or relating to the . . . removal of node from neck and all other acts appropriately related [thereto]. . . ." On June 11 Dr. Dickson surgically removed the node; Mrs. Simpson was discharged from the hospital on June 14. Immediately following the surgery, Mrs. Simpson started to experience weakness in her left arm, tingling sensations in her fingers, pain in the back of her neck, pain in her shoulder, and difficulty using her left arm. Prior to the surgery by Dr. Dickson, Mrs. Simpson was not experiencing any weakness or limitation of motion in her left shoulder or left arm. Since the surgery she has had limited use of her left shoulder and left arm and is no longer able to elevate her left arm above the shoulder. The prognosis is that her condition will probably not improve in the future.

Mrs. Simpson contacted Dr. Jesus Hiromoto in July 1980 when the difficulty with her left shoulder continued. Dr. Hiromoto did exploratory surgery and diagnosed her problem as a "left spinal accessory nerve lesion," which he explained in his deposition to mean "some sort of damage to the nerve." Dr. Hiromoto's conclusion was that the surgery perfomed by Dr. Dickson probably caused the damage. However, he stated that there was no visible damage or cutting of the nerve. He also stated that the injury to the nerve was an accepted risk of the surgery; i.e., something that can happen without the existence of negligence on the part of the doctor. Dr. Hiromoto went on to discuss the area of the neck where the surgery was performed by Dr. Dickson. "Q. Is it advisable to do surgery in that area? A. No, it's not. It's unadvisable. You could do it. Q. You're just saying you have to be careful. A. I've got to be looking at things and seeing . . . what I am doing. In some other places that you know you don't want to damage a nerve, you go more — you go a more expedient way. . . . There are places where you have to watch. Let's say that if you cut in the artery here, you know that you — when an incision is here, you're going to cut an artery, but you cut somewhere here, and you will not cut an artery. . . . I know that, because I'm a neurosurgeon. Q. Yes, sir. I understand. And, the area where the lymph node was removed is an area you have to be especially careful; is that what

you're saying? A. Yes." Dr. Hiromoto stated that the problem experienced by Mrs. Simpson is a known risk of the type of surgery performed by Dr. Dickson.

Dr. Dickson deposed that he was aware of possible dangers, particularly nerve damage, associated with neck surgery. As a general practitioner, he stated that he did the surgery on Mrs. Simpson only because of the very superficial location of the node. "I don't go into deeper areas of the neck." Dr. Dickson did not recommend removal of the node to Mrs. Simpson because it would have been expected to eventually have cleared up with further antibiotics and time. However, he stated that she was anxious to have it removed because it was hurting her. The risks associated with the surgery were never discussed between Dr. Dickson and Mrs. Simpson. Dr. Dickson averred that he exercised the degree of skill and learning ordinarily exercised and possessed by members of his profession generally at the time in question and used reasonable care and diligence in the exercise of his best judgment in the application of his skill to the treatment of Mrs. Simpson.

1. The Simpsons contend that Dr. Hiromoto's testimony contained sufficient equivocation to make a jury issue, citing *Lawrence v. Gardner,* 154 Ga. App. 722 (270 SE2d 9) (1980). However, we concur with the trial court's finding that *Lawrence v. Gardner,* supra, is distinguishable from the case at bar: "In *Lawrence* the three non-party doctors testified that it was *possible* for the complication to occur without medical negligence. Additionally, there was equivocation by the physician who stated that while he would not say that the doctor did not attain the proper standard of care, he could not say that he *did* attain the proper standard of care. In the case sub judice, Dr. Hiromoto very simply stated that, although he could not ascertain any damage to the spinal accessory nerve, the nerve was *probably* damaged during . . . Dr. Dickson's surgery but went on to say that, if damage to the spinal accessory nerve had happened during Dr. Dickson's surgery, it would have been inadvertent, in his opinion, and would have been an accepted risk of surgery. Dr. Hiromoto did not say [or imply] that [Mrs. Simpson's] condition *could* have resulted from medical negligence, nor did he say [or imply] that Dr. Dickson failed to exercise the requisite degree of care and skill in his surgery."

"To establish professional negligence the evidence presented by the patient must show a violation of the degree of care and skill required by a physician. [Cit.] Such standard of care is that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally. [Cits.] There is a presumption that medical or surgical services were performed in an

ordinary skillful manner and the burden is on the plaintiff to show failure to exercise due care and skill. [Cits.] Excepting in a few extreme circumstances, the question of compliance with the required standards must be presented through expert testimony. [Cits.] As was said in *Mayo v. McClung,* 83 Ga. App. 548, 556 (2a) (64 SE2d 330) [(1951)]: 'It was not a question of what one individual doctor thought was advisable.'

"Measuring the medical testimony presented for [the Simpsons] as to this point, it appears that their [doctor] presented [his] individual views and [his] individual practices. Thus there was no valid legal evidence to contradict that presented [by Dr. Dickson] as to the degree of care and skill exercised by the medical community generally." *Kenney v. Piedmont Hospital,* 136 Ga. App. 660, 664 (222 SE2d 162) (1975). Compare *Gragg v. Spenser,* 159 Ga. App. 525 (284 SE2d 40) (1981).

2. The Georgia Medical Consent Law in part provides: "A consent to surgical or medical treatment which discloses in general terms the treatment or course of treatment in connection with which it is given and which is duly evidenced in writing and signed by the patient... shall be conclusively presumed to be a valid consent in the absence of fraudulent misrepresentations of material facts in obtaining the same." OCGA § 31-9-6(d) (formerly Code Ann. § 88-2906). This court has interpreted this statute as expressing "a legislative intent as to the duty of the doctor regarding disclosure in order to obtain a valid consent. It provides that the physician must disclose *in general terms the treatment or course of treatment* in connection with which the consent is given. The legislature thus set forth the requisite disclosures necessary to render a consent valid.... We cannot interpret the requirement of disclosing *in general terms the treatment or [course] of treatment* as including a requirement for disclosure of risks of treatment." *Young v. Yarn,* 136 Ga. App. 737, 738 (222 SE2d 113) (1975). Thus, Georgia (apparently alone among the states) does not follow the doctrine of informed consent. See 61 AmJur2d, Physicians, Surgeons, and Other Healers, § 187; see also 70 CJS, Physicians and Surgeons, § 48(g). "Briefly stated, this rule is that a consent to a treatment or diagnostic test obtained without disclosure of the hazards or dangers involved, is no consent." *Mull v. Emory University,* 114 Ga. App. 63, 65-6 (150 SE2d 276) (1966). The Simpsons argue that this court's interpretation of the statute was incorrect and not that intended by the legislature.

Our decision in *Young v. Yarn,* supra, has been both criticized (Note, "Consent to Elective Surgery Valid Even If Doctor Didn't Warn of Known Risks," 28 Mercer L. Rev. 377 (1976)) and applauded (Tanner and Schroder, "Informed Consent: New Georgia

Guidelines," 12 Ga. State Bar J. 197 (1976)). Yet, the interpretation given the statute in *Young v. Yarn* has been repeatedly followed with entire unanimity by different judges comprising different panels of this court from those who made the decision. See, e.g., *Holbrook v. Schatten,* 165 Ga. App. 217 (299 SE2d 128) (1983); *Butler v. Brown,* 162 Ga. App. 376 (290 SE2d 293) (1982); *Blount v. Moore,* 159 Ga. App. 80 (4) (282 SE2d 720) (1981); *Parr v. Palmyra Park Hospital,* 139 Ga. App. 457 (228 SE2d 596) (1976); *McMullen v. Vaughan,* 138 Ga. App. 718 (3) (227 SE2d 440) (1976). "It is true that 'stare decisis' is a matter of judicial policy rather than judicial power. In this regard the common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions. However, even those who regard 'stare decisis' with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute. Once the court interprets the statute, 'the interpretation . . . has become an integral part of the statute.' [Cits.] This having been done, any subsequent 'reinterpretation' would be no different in effect from a judicial alteration of language that the General Assembly itself placed in the statute." *Walker v. Walker,* 122 Ga. App. 545, 546 (178 SE2d 46) (1970); *Mitchell v. State,* 239 Ga. 3 (2) (235 SE2d 509) (1977); *Williams v. Ray,* 146 Ga. App. 333 (2) (246 SE2d 387) (1978). "If this Court has been wrong from the beginning, on this subject, let the legislative power be invoked to prescribe a new rule for the future; until altered by that power, we are disposed to adhere to the rule which has been so long applied by our Courts and is so well known to the legal profession." *Adams v. Brooks,* 35 Ga. 63, 66 (1866).

*Judgment affirmed. Quillian, P. J., and Sognier, J., concur.*

DECIDED JULY 7, 1983.

*Richard M. Cowart, Edwin G. Barham,* for appellants.
*Wade H. Coleman,* for appellee.