S99G0600. ALBANY UROLOGY CLINIC, P.C. et al.
v. CLEVELAND et al.
(528 SE2d 777)

SEARS, Justice.

Certiorari was granted to consider the Court of Appeals' ruling that a patient was authorized to bring a claim against a physician for the latter's failure to disclose his use of illegal drugs.[1] The evidence of record indicates that during the general time of the patient's treatment, the physician used drugs outside of work and when he was not on call. In its ruling, the Court of Appeals concluded that one who suffers injury during medical treatment that was consented to in conjunction with a "physician's . . . non-disclosure, or concealment of a material fact which the patient has a right to know," in this case illegal drug use, entitles the patient to recover damages for fraud and battery.[2] We conclude, however, that absent inquiry by a patient or client, there is neither a common law nor a statutory duty on the part of either physicians or other professionals to disclose to their patients or clients unspecified life factors which might be subjectively consid-

---

[1] *Cleveland v. Albany Urology Clinic,* 235 Ga. App. 838 (509 SE2d 664) (1998).

[2] Id., 235 Ga. App. at 840.

ered to adversely affect the professional's performance. It follows that the failure to make such voluntary disclosure cannot provide a basis for a fraud claim, nor can it vitiate a patient's consent so as to authorize an action for battery. Therefore, while we find the physician's behavior reprehensible, we must reverse.

In 1993, appellee William Cleveland consulted with urologist Timothy Trulock, M.D., about a lump on the underside of his penis. Trulock expressed concern that Cleveland might have penile cancer and after Cleveland signed an informed consent statement, Trulock performed surgery under general anesthesia to remove the lump. Thereafter, Cleveland began to experience an acutely painful ninety-degree curvature of his penis upon erection, and a resulting inability to have intercourse. Cleveland sued Trulock and the Albany Urology Clinic where he practiced (collectively "Trulock"), claiming that Trulock negligently performed unnecessary surgery for non-existent penile cancer, and thereby exacerbated Cleveland's medical condition. In his complaint, Cleveland alleged that Trulock was liable for medical negligence; battery; breach of contract, warranty, and guarantee of cure. Cleveland later amended his complaint to add an assertion that Trulock had fraudulently concealed or misrepresented his "illegal use and abuse of cocaine, substance abuse problem, and impairment" at the time of Cleveland's treatment.[3] In addition, Cleveland's wife sued for loss of consortium. Cleveland's expert testified that the lump on his penis was not caused by cancer but rather by Peyronie's Disease,[4] which might have been confirmed with proper testing and treated effectively without surgery.

Prior to trial, the court dismissed Cleveland's claim for battery after finding the pleading defective under OCGA § 31-9-6.1 (a). The jury returned a defendant's verdict on the malpractice claim, but returned plaintiffs' verdicts on the claim for fraudulent concealment or misrepresentation of Trulock's use of cocaine at the time of treatment. The trial court subsequently granted Trulock's motion for judgment notwithstanding the verdict, holding that because Trulock had no duty to disclose his cocaine use, Cleveland's fraud claim failed as a matter of law. The trial court also concluded that the evidence failed to establish the requisite intent for a claim of fraud.

The Court of Appeals reversed, and held that Trulock's failure to

---

[3] There is no direct evidence of record that Trulock was under the immediate or residual influence of cocaine at the time he made decisions regarding Cleveland's treatment and performed surgery. However, it also appears from the record that some time after Cleveland's procedure, Trulock was admitted to a rehabilitation facility for drug treatment, and that this fact became known during discovery in the underlying action.

[4] Peyronie's Disease is a condition where collagen deposits become calcified in the tunica of the penis secondary to an inflammation process. It is generally a benign condition that may respond to simple vitamin therapy.

voluntarily disclose his cocaine use at the time of Cleveland's treatment was equivalent to an actual misrepresentation, and thus entitled Cleveland to file a fraud claim that was separate and distinct from his claim for medical negligence, notwithstanding the absence of evidence showing a proximate connection between Trulock's drug use and Cleveland's injury. The Court of Appeals also reversed the trial court's dismissal of Cleveland's claim for battery.

This Court granted certiorari to determine: (1) Whether there exists a duty arising from all professional relationships to disclose any factor or factors of the professional's life which might adversely affect the professional's performance; (2) Whether the failure to disclose such factors supports an action for fraud and battery; and if so, (3) Whether recovery in a suit for fraud or battery under such circumstances would require proof of damages arising from the professional's performance.

1. Prior to 1988, Georgia physicians were not required to disclose to their patients any of the risks associated with a particular medical treatment or procedure. Hence, before 1988, a physician's "silence as to risk" was not actionable and could not be the basis of a patient's claim of fraud.[5] Although a physician did then and does now have a common law duty to answer truthfully a patient's questions regarding medical or procedural risks, absent such inquiry the common law of this state does not designate the failure to disclose such risks a fraud that may vitiate a patient's consent to medical procedures.[6] As established by pre-1988 precedent, under the common law, evidence of a failure to reveal the risks associated with medical treatment is not even admissible in support of a claim for professional negligence.[7]

As recognized by Georgia's appellate courts, this common law rule could be changed only by legislative act.[8] That occurred in 1988, when the General Assembly adopted the Informed Consent Doctrine, OCGA § 31-9-6.1, which became effective on January 1, 1989. Section 31-9-6.1 sets forth six specified categories of information that must be disclosed by medical care providers to their patients before they undergo certain specified surgical or diagnostic procedures.[9] The

---

[5] See *Young v. Yarn*, 136 Ga. App. 737, 738 (222 SE2d 113) (1975); see also *Spikes v. Heath*, 175 Ga. App. 187, 188 (332 SE2d 889) (1985) (a physician is under no duty to disclose the risks of treatment, and the failure to do so is not actionable); *Padgett v. Ferrier*, 172 Ga. App. 335, 335-336 (323 SE2d 166) (1984) (doctrine of informed consent not applicable in Georgia and the failure to reveal risks of treatment cannot give rise to fraud claim).

[6] See *Padgett*, supra; *Spikes*, supra.

[7] *Padgett*, 172 Ga. App. at 335; *Hyles v. Cockrill*, 169 Ga. App. 132, 133 (312 SE2d 124) (1983).

[8] *Spikes*, 175 Ga. App. at 188 n. 2; *Simpson v. Dickson*, 167 Ga. App. 344, 347-348 (306 SE2d 404) (1983).

[9] These are: (1) the patient's diagnosis necessitating the procedure; (2) the nature and purpose of the procedure; (3) the generally recognized and accepted material risks of infec-

Georgia informed consent statute does not impose a general require-
ment of disclosure upon physicians; rather, it requires physicians to
disclose only those factors listed in OCGA § 31-9-6.1 (a).[10] This statu-
tory list of mandatory disclosures does not include a requirement
that physicians disclose to their patients any aspect of their personal
lives which might adversely affect their professional performance.

Because OCGA § 31-9-6.1 is in derogation of the common law
rule against requiring physicians to disclose medical risks to their
patients, it must be strictly construed and cannot be extended
beyond its plain and explicit terms.[11] Thus, in situations not covered
by the statute's language, the common law rule must still govern, as
courts are without authority to impose disclosure requirements upon
physicians in addition to those requirements already set forth by the
General Assembly.[12]

It follows that, notwithstanding the repugnance of Trulock's con-
duct at the time he rendered medical services to Cleveland, the Court
of Appeals erred in concluding that Trulock was under an affirmative
obligation, either under statute or common law, to disclose his drug
use to his patients prior to rendering services, and that Trulock's fail-
ure to make such disclosure was the basis for an independent cause
of action against him. In so doing, the Court of Appeals impermissi-
bly expanded upon the statutory disclosures required of health care
providers, and imposed upon health care providers a new, judicially-
created, duty of disclosure. As explained above, that action was
beyond the scope of the appellate court's authority, and it must there-
fore be reversed.

2. The Court of Appeals also erred in ruling that Trulock's non-
disclosure of his cocaine use at the time of Cleveland's treatment
entitled the latter to file a fraud claim seeking damages. Because, as
explained above, Trulock was not under a duty to make any disclo-
sures regarding his personal life factors, the failure to make such dis-
closure cannot logically support a claim for fraudulent concealment
or nondisclosure. The Court of Appeals, however, upheld Cleveland's
independent fraud claim based solely upon Trulock's concealment of
a negative factor in his life that, although he was not obligated to dis-
close, nonetheless might have adversely affected his professional per-

---

tion, allergic reaction, disfigurement, brain or heart damage, etc. associated with the proce-
dure; (4) the likelihood of the procedure's success; (5) the practical, accepted and recognized
alternatives to the procedure; and (6) the patient's prognosis if the procedure is rejected.
OCGA § 31-9-6.1 (a) (1)-(6).

[10] See *Butler v. South Fulton Med. Ctr.*, 215 Ga. App. 809 (452 SE2d 768) (1994); *Moore
v. Baker*, 989 F2d 1129 (11th Cir. 1993).

[11] *Bo Fancy Productions v. Rabun County Bd. of Commrs.*, 267 Ga. 341, 343 (478 SE2d
373) (1996); *Fayette County v. Seagraves*, 245 Ga. 196, 197-198 (264 SE2d 13) (1980).

[12] *Simpson*, 167 Ga. App. at 348.

formance in treating Cleveland. Notably, the Court of Appeals held that such a claim was separate and distinct from Cleveland's claim of medical negligence. Neither the Code nor the case law authorized treating this claim independently from Cleveland's claim for malpractice.

A full and adequate remedy for Cleveland's injuries in this case is already provided by existing law — the right to sue Trulock for professional negligence. Thus, Cleveland was not deprived of the legal means by which to recover fully for his injuries, and it was not necessary for the Court of Appeals to carve out a previously unrecognized cause of action for fraudulent concealment by a professional of a life factor that might adversely affect his performance. Certainly any evidence relevant to Cleveland's claim that Trulock rendered deficient professional services, including evidence that Trulock used illegal drugs at the time such services were rendered that might have impacted upon his performance, is admissible in support of Cleveland's malpractice claim. However, a professional's failure to disclose personal factors such as illicit drug use does not constitute an independent and distinct fraud action that is separate from a malpractice action. Even where certain disclosure requirements are mandated under the Informed Consent Doctrine, the legislature has specified that a medical provider's failure to make the requisite disclosures does not constitute an independent cause of action, but rather may only give rise to and support a claim of professional negligence.[13] It follows that the failure to make disclosures that are not required cannot give rise to an independent cause of action, either. Therefore, the Court of Appeals erred by judicially creating an independent cause of action permitting Cleveland to allege that Trulock fraudulently withheld voluntary disclosure of his drug use at the time he rendered professional services to Cleveland, and in treating such claim independently from Cleveland's claim for malpractice.[14]

3. The Court of Appeals also erred in reviving Cleveland's battery claim against Trulock. If a physician obtains consent for touching another in the course of treatment by some artifice directly

---

[13] OCGA § 31-9-6.1 (d).

[14] It also bears noting that in creating this new cause of action, the Court of Appeals disregarded the requirement that before damages are recoverable, it must be established that the wrongful conduct complained of proximately caused loss and damage to the plaintiff. *Bacote v. Wyckoff*, 251 Ga. 862, 865 (310 SE2d 520) (1984); see *Reynolds v. Flint River Tech. Inst.*, 223 Ga. App. 240 (477 SE2d 393) (1996). In this case, the record appears not to include evidence that Trulock was under either the direct or residual influence of cocaine at the time he treated Cleveland. While unnecessary to our decision in this case, that failure of proximate causal connection might also be fatal to the Court of Appeals' ruling. In this same regard, the successful pursuit of a fraud claim, even one within the professional context, requires a showing of an intention to deceive, see *Hunter &c. v. Frame*, 269 Ga. 844, 849 (507 SE2d 411) (1998), and the record in this case appears to be void of such evidence.

related to his or her professional relationship with a patient, then the consent may not be valid and the touching may have been unlawful, making the physician liable for battery. Thus, where a physician knowingly misrepresents a patient's condition or the proper treatment,[15] or fails to truthfully respond to a patient's queries about a diagnosis or treatment,[16] or performs procedures outside the scope of consent,[17] a patient's consent may be vitiated, leaving the physician liable for having committed a battery.

Thus, obtaining consent for medical treatment by an artifice that is directly related to the subject matter of the professional relationship — i.e.: diagnoses, treatments, procedures — may result in an unlawful touching that supports a battery claim. However, we decline to extend this rule of law to situations such as the present case, where (1) a physician fails to disclose on his own initiative a negative personal life factor that, although not directly related to the professional relationship, may, depending upon a patient's subjectively held beliefs, impact upon the patient's consent to be touched in the course of treatment,[18] and (2) there is no direct evidence of record that the physician was impaired or affected by the negative personal life factor at the time consent was obtained and treatment was rendered.

Cleveland urges, quite naturally, that he would not have consented to treatment had he known of Trulock's cocaine use outside of work. We do not question the sincerity or merit of this argument. However, there is no evidence of record showing a causal nexus between Cleveland's consent to treatment (and his resulting injury) and Trulock's drug use, and we cannot allow a cause of action for battery to be based upon pure speculation that such a nexus exists. In this case, the unknown factor which Cleveland claims would have caused him to withhold his consent is too attenuated from the subject matter of the professional relationship to support a battery claim. Therefore, the Court of Appeals erred in reviving Cleveland's cause of action for battery.

4. We also note that there are compelling public policy reasons that militate against creating an independent cause of action for fraud and battery based upon a professional's failure to disclose life factors that might be detrimental to the rendering of services to patients or clients. First among these is the impossibility of defining which of a professional's life factors would be subject to such a disclo-

---

[15] See, e.g., *Boggs v. Bosley Medical Inst.*, 228 Ga. App. 598 (492 SE2d 264) (1997); *Smith v. Wilfong*, 218 Ga. App. 503 (462 SE2d 163) (1995).

[16] See, e.g., *Spikes*, supra.

[17] See, e.g., *Joiner v. Lee*, 197 Ga. App. 754 (399 SE2d 516) (1990).

[18] See also Division 4, infra.

sure requirement. Indeed, in arguing before this Court, Cleveland concedes that because every situation is different, and because every patient or client has unique sensibilities, it would be impossible to say what a professional is required to disclose in any given professional relationship. This concession highlights the difficulty of ascertaining standards that would guide both professionals and their clients if such a new disclosure requirement existed, and underscores the fact that such standards would, in large part, be based upon a plaintiff's subjective beliefs and standards.[19]

Accordingly, we conclude that public policy concerns support our decision to reverse the Court of Appeals' decision to permit the filing of independent claims for fraud and battery based upon a medical

---

[19] These concerns are perhaps best described by hypothetical scenarios: Consider an attorney who, on most nights, drinks between four and five glasses of wine between the time he arrives home from work and the time he retires for the evening. He is never intoxicated or hung over at work, and he never misses or is late for a work-related event. No one has ever suggested to him, and he does not suspect, that his wine drinking affects his professional performance. However, his doctor informs him that he may be a "binge drinker," and may have a drinking problem. See *National Institute on Alcohol and Alcoholism Alcohol Alert No. 37* (U. S. Dept. of Health & Human Services Publications, July 1997) (having five or more drinks in a row may be indicative of "binge drinking"). Having been so informed, does the attorney have an affirmative duty to disclose this life factor — a diagnosed drinking problem which conceivably could affect his professional performance — to every current and prospective client? If so, does his failure to make such disclosure create a cause of action against him regardless of whether his work is competently performed? What if the lawyer is aware that his client is opposed to the drinking of alcohol on moral or religious grounds, does that create a heightened duty of disclosure on the lawyer's part with regard to that particular client?

Or consider the internist who, the night before receiving patients, is served with divorce papers or learns of an elderly parent's illness. Both of these incidents are naturally upsetting and might be considered by some to potentially impact the internist's ability to render professional services. However, the internist believes that, despite the receipt of bad news, she can treat her patients competently. Is she nonetheless obligated to inform patients of the prior evening's events, regardless of whether she actually violates the applicable standard of care in treating them? What if the internist had a mastectomy the month before and is currently undergoing preventative chemotherapy that weakens her physically, does she have an obligation to disclose that life factor to all of her patients, since it might be deemed to affect her professional performance?

These hypothetical scenarios and the questions they raise (which we do not attempt to answer here) exemplify the uncertainty that would ensue if the Court of Appeals' opinion in this matter were allowed to stand. No ascertainable standards exist by which these professionals may gauge whether their failure to voluntarily disclose certain life factors to their patients or clients might leave them liable for damages. Moreover, whether a duty of disclosure even exists in any given scenario turns in large part upon (1) the particular profession engaged in, (2) the services being rendered, and (3) the subjective beliefs of the professional's patient or client. Not only do these variables raise constitutional vagueness concerns, see *State v. Johnson*, 270 Ga. 111, 112 (507 SE2d 443) (1998) (law cannot impose unconstitutionally vague duties, rather it must "furnish a test based on normal criteria which men of common intelligence . . . may use with reasonable safety in determining its command."), they also highlight how the duty of disclosure required by the Court of Appeals' opinion would raise an impracticable, if not impossible, impediment to the efficient rendering of professional services.

professional's failure to disclose a life factor which may be subjectively considered to impact negatively upon the provision of services.

5. To conclude, neither the common law nor the Code impose a duty upon physicians or any other professional to disclose personal life factors which might adversely affect their professional performance. Hence, the failure to make such disclosure cannot be a basis for either a fraud or battery claim. Furthermore, plaintiffs cannot file a claim asserting non-disclosure of a life factor by a professional that is separate and distinct from a claim for malpractice or professional negligence, but they may assert such allegations in support of their malpractice or professional negligence claims. Finally, public policy dictates against imposing such a duty of disclosure upon professionals. For all of these reasons, we reverse the Court of Appeals' opinion in this matter.

*Judgment reversed. All the Justices concur, except Hunstein, Carley and Thompson, JJ., who concur in part and dissent in part.*

CARLEY, Justice, concurring in part and dissenting in part.

I concur in the majority's holding that the judgment cannot rest upon the theory that Dr. Trulock's non-disclosure of his cocaine use is actionable as an independent tort of fraud. I do not, however, agree with the majority's conclusion that a recovery cannot be based upon the alternative theory that Dr. Trulock committed a battery against Mr. Cleveland.

Medical negligence is not the only possible tort which can arise from the doctor-patient relationship. To avoid civil liability for a battery, a physician has the duty to obtain his patient's consent to undergo treatment. OCGA §§ 51-1-13; 51-11-1. "The relation of physician and patient is a consensual one, and a physician who undertakes to treat another without express or implied consent of the patient is guilty of at least a technical battery." *Mims v. Boland*, 110 Ga. App. 477 (2) (138 SE2d 902) (1964). Insofar as Dr. Trulock's civil liability for commission of a battery is concerned, it is immaterial whether he conformed to the applicable standard of care, since performance of an unauthorized medical procedure is actionable regardless of the skill with which it was accomplished. See *Irwin v. Arrendale*, 117 Ga. App. 1, 5 (4) (159 SE2d 719) (1967). Likewise, the question of damages is not a bar to Mr. Cleveland's recovery under a battery theory, since nominal damages are authorized even if the injury is small or the mitigating factors are strong. OCGA § 51-12-4; *Southern Finance Co. v. Alexander*, 113 Ga. App. 740, 741 (2) (149 SE2d 526) (1966). "As a general rule, no tort is committed against a person who consents to medical treatment *unless* that consent is not freely obtained or is obtained by fraud. [Cit.] A *valid* general consent negates any actionable claim for battery. [Cits.]" (Emphasis sup-

plied.) *Lloyd v. Kramer*, 233 Ga. App. 372, 375 (1) (503 SE2d 632) (1998). The dispositive issue in this case is whether Dr. Trulock's failure to disclose his use of and addiction to cocaine was a fraudulent misrepresentation of a material fact which invalidated Mr. Cleveland's consent to undergo the recommended surgical procedure. In this connection, the record shows that Dr. Trulock specifically admitted that he *intended* for his patients not to know that he used cocaine.

A physician and patient share a confidential relationship. *Keenan v. Plouffe*, 267 Ga. 791, 794 (2) (482 SE2d 253) (1997). Where such a relationship exists, silence when one should speak or the failure to disclose what one ought to reveal is equivalent to an actual affirmative false representation. *Morris v. Johnstone*, 172 Ga. 598, 605 (158 SE 308) (1931). OCGA § 31-9-6.1 (a) enumerates certain general risks that are inherent in medical procedures, which risks the physician must disclose so as to obtain the patient's valid consent. Because the doctor's use of an *illegal* drug is not included in the statutory list, the majority concludes that there is no requirement for disclosure absent a specific inquiry by the patient. Were Dr. Trulock's use of illegal drugs a general and inherent risk of the medical procedure which he recommended, I could agree that its absence from the list in OCGA § 31-9-6.1 (a) is dispositive of Mr. Cleveland's battery claim. However, the General Assembly's mandated disclosure of the general and inherent risks of a medical procedure does not indicate a legislative intent to insulate a physician from liability for the fraudulent concealment of any and all *other* forms of risks to the patient. In my opinion, the concept of valid consent to undergo a medical procedure encompasses more than the procedure itself, and includes the qualifications or lack thereof of the one who is proposing himself as the professional who will perform that procedure. See *Sutlive v. Hackney*, 164 Ga. App. 740, 742 (297 SE2d 515) (1982), overruled on other grounds, *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 849 (1) (507 SE2d 411) (1998). " 'Consent' is 'a voluntary yielding of the will,' or 'a rational and voluntary concurrence in an act.' [Cit.] . . . Consent is an act of reason accompanied with deliberation. [Cit.]" *Shehany v. Lowry*, 170 Ga. 70, 72 (152 SE 114) (1930). Dr. Trulock obtained Mr. Cleveland's consent to undergo the recommended medical procedure *and* to perform that procedure himself. Certainly, the qualifications of the particular physician, no less than the general and inherent risks of the suggested medical procedure, are of concern to the patient whose authorization is being sought. With regard to the risks of the procedure itself, Dr. Trulock complied with OCGA § 31-9-6.1 (a) and made the requisite disclosures. However, the controlling issue is whether Dr. Trulock's illegal drug use was material to Mr. Cleveland's consent to undergo the recommended

procedure, and the mere fact that that factor is not otherwise enumerated in the irrelevant provisions of OCGA § 31-9-6.1 (a) should have no bearing on the determination of this issue.

Except in plain and palpable cases, the issue of materiality must be submitted to the jury. *Norris v. Hart*, 74 Ga. App. 444, 446 (40 SE2d 96) (1946). Under the evidence, Dr. Trulock's failure to disclose his cocaine use is not clearly and palpably immaterial to Mr. Cleveland's consent to undergo the medical procedure. Indeed, the majority concedes the materiality of the non-disclosure by acknowledging that it cannot question the sincerity or merit of Mr. Cleveland's assertion that he would not have consented to treatment by Dr. Trulock had the cocaine use been disclosed. If the jury was authorized to believe Mr. Cleveland's contention that the undisclosed cocaine use was material to his decision to accept Dr. Trulock's recommendation, then neither the trial court nor this Court is authorized to conclude that, to the contrary, Mr. Cleveland's consent nevertheless was valid as a matter of law. *Norris v. Hart*, supra.

Seeking to justify its decision on public policy grounds, the majority opines that it is impossible to define those life factors which should be subject to disclosure by a professional. This public policy argument is completely irrelevant, however, since we deal here only with the medical profession and the specific requirement that, in order to avoid liability for the intentional tort of battery, the physician must obtain the patient's consent. Indeed, in the context of this case, we do not even need to draw a bright line rule establishing exactly what a physician who is charged with a battery must disclose in order to demonstrate that the patient gave a valid consent to the touching. It is undisputed that, at the time of the procedure, Dr. Trulock was addicted to and used cocaine and that the use of that drug is always illegal. OCGA §§ 16-13-26 (1) (D); 16-13-30 (a). Both the commission of a crime of moral turpitude and the use of illegal drugs are factors which can result in the loss of a physician's license to practice medicine in this state. OCGA § 43-34-37 (a) (4), (13). Thus, resolution of this case does not depend on whether Dr. Trulock measures up to Mr. Cleveland's subjective beliefs and standards. Dr. Trulock has violated the beliefs and standards of society in general and his profession in specific. Regardless of where the line ultimately is drawn with regard to a doctor's duty to disclose in order to avoid civil liability for an unauthorized touching, Dr. Trulock crossed that line when he obtained Mr. Cleveland's consent without disclosing a factor which could result in the doctor's criminal prosecution and put his professional license in jeopardy.

In my opinion, this appeal is controlled by the principle that consent which is obtained by a material misrepresentation is invalid, since fraud vitiates all contracts. See generally *Dye v. Wall*, 6 Ga.

584, 586 (1) (1849). The majority creates an exception to that rule when the contract at issue involves a physician who offers to perform a recommended procedure and a patient who agrees to accept that recommendation. In accordance with today's opinion, such an agreement is valid, as a matter of law, despite the physician's *intentional* suppression of the fact of his ongoing addiction to and use of cocaine, which fact was clearly material to the validity of the patient's consent. Because I believe that a jury would be authorized to find that Dr. Trulock's non-disclosure of his addiction to and use of cocaine vitiated Mr. Cleveland's consent to undergo the medical procedure, I dissent to the determination that the judgment cannot rest on a battery theory.

I am authorized to state that Justice Hunstein and Justice Thompson join in this opinion.

DECIDED MARCH 6, 2000 —
RECONSIDERATION DENIED APRIL 13, 2000.

*Watson, Spence, Lowe & Chambless, Thomas S. Chambless, Dawn O. Benson, Donaldson, Bell & Pickett, George P. Donaldson III, Tillman, McTier, Coleman & Talley, Wade H. Coleman,* for appellants.

*William S. Stone, T. Craig Earnest,* for appellees.

*Troutman Sanders, Harold G. Clarke, Hall, Booth, Smith & Slover, John E. Hall, Jr., Jonathan Marigliano, Bondurant, Mixson & Elmore, Emmet J. Bondurant, Michael B. Terry, Frank M. Lowrey IV, Rogers & Hardin, Robert B. Remar, Webb, Carlock, Copeland, Semler & Stair, Thomas S. Carlock, Thrasher, Whitley, Hampton & Morgan, Robert E. Whitley, William M. Earnest, Jr., Alston & Bird, Jack S. Schroder, Jr., Angela T. Burnette, Tisinger, Tisinger, Vance & Greer, David H. Tisinger, Richard G. Tisinger, Jr., David A. Cook, William T. Clark,* amici curiae.