A11A0485. BOSTON MEN'S HEALTH CENTER, INC.
v. HOWARD.
(715 SE2d 704)

DILLARD, Judge.

In this civil action, John Henry Howard sued Dr. William Powell, Boston Medical Group ("BMG"), Aaron Hardge, and Boston Men's Health Center, Inc. ("BMHC"), among others, for damages he allegedly suffered as a result of the defendants' medical malpractice and fraud. The case was tried before a jury, but prior to the conclusion of that trial, Howard dismissed or settled with all defendants except BMHC. Thereafter, the jury rendered a verdict in favor of Howard, awarding him compensatory and punitive damages, and the trial court entered judgment against BMHC. BMHC now

---

appeals, arguing that the trial court erred in (1) instructing the jury on the physician-patient confidential relationship and a physician's duty to disclose despite the fact that no physician remained as a party and BMHC never employed any physician; (2) failing to grant judgment in BMHC's favor because Howard did not provide sufficient evidence that BMHC proximately caused his injury; (3) failing to instruct the jury on apportionment of damages; and (4) denying BMHC's motion for judgment notwithstanding the verdict ("j.n.o.v.") as to punitive damages. For the reasons noted infra, we conclude the trial court's error in instructing the jury on the physician-patient relationship and a physician's duty to disclose requires reversal, and we therefore remand this case for a retrial consistent with this opinion.

At the outset, we note that "[t]his Court reviews the judgment entered by the trial court after approval of a jury verdict upon the any evidence test, absent any material error of law."[1] Additionally, "[w]e review questions of law de novo, applying the plain legal error standard of review."[2]

So viewed, the evidence shows that in approximately 1999, Dr. Quoc Ha founded a group of medical clinics to treat erectile dysfunction ("ED"), doing business generally as "Boston Medical Group." At that time, there were twenty-two BMG clinics operating in thirteen different states, including one in Atlanta, which did business under the name BMG-Georgia. Boston Men's Health Center, Inc.—a related but separate entity—was a management company that supplied all nonphysician personnel to BMG clinics throughout the country pursuant to a Management Services Agreement. Under that same agreement, BMG was responsible for employing its own physicians.

On September 30, 2006, then 50-year-old John Howard went to the BMG clinic in Atlanta after repeatedly hearing its advertisements on the radio. And upon arriving at the clinic that morning, Howard met with Dr. Powell, who examined Howard and advised him that he wanted to administer a test dose of ED medication via an injection into Howard's penis. While ED is usually initially treated with oral medications, the primary treatment option offered at BMG clinics is a procedure known as intracavernous pharmacotherapy ("ICP"), which entails the patient self-administering an injection of medication directly into his penis in order to induce an erection. After discussing the ICP treatment option with Dr. Powell, Howard

---

[1] *Timmons v. Cook*, 287 Ga. App. 712, 712 (652 SE2d 604) (2007) (citation and punctuation omitted).

[2] *Id.* (citation omitted).

consented to Dr. Powell's request, and Dr. Powell then gave him the injection, which induced an erection within ten minutes. After examining Howard again a few minutes later, Dr. Powell informed Howard that the medication was working and that his associate, Hardge (a medical advisor employed by BMHC but supervised by Dr. Powell), would explain how to self-administer the ICP injections and discuss with him the various purchase options offered by BMG. During their subsequent discussion, Hardge advised Howard that ICP was safe to use and that his ED would be "cured" if he followed BMG's six-month treatment plan.

After speaking with Hardge, Howard remained at the clinic so that Hardge could monitor him for signs of priapism, which is a prolonged erection lasting more than four hours that can cause permanent damage to the penis.[3] And when Howard's erection had not dissipated a half hour after the initial test-dose injection, Hardge gave Howard an oral medication to reverse the effect of the ICP. But over an hour later, Howard's erection had still not significantly dissipated. Consequently, Dr. Powell administered an epinephrine injection directly into Howard's penis in an effort to dissipate his erection. This injection eventually reduced Howard's erection to the point where he was told that he could leave the clinic; however, Howard still maintained a significant erection for the remainder of the day. According to Howard, neither Dr. Powell nor Hardge ever informed him that he was being kept at the clinic because his erection had not dissipated within the normal amount of time. To the contrary, Hardge told Howard that this was part of the normal "building process," and then discussed various treatment purchase options with him. Furthermore, although Howard was provided with written materials that discussed the risk of priapism, neither Dr. Powell nor Hardge verbally warned Howard of that risk. Understandably impressed by the immediate results he experienced from the initial test dose, Howard purchased the six-month treatment plan.

Approximately one week later, Howard received his ICP prescription in the mail. The following Saturday around 7:00 p.m., Howard gave himself an ICP injection, and he and his wife engaged in sexual intercourse. Howard went to sleep that night with a partial erection, and the next morning, Howard awoke with a full erection, which did not significantly dissipate over the course of the day. Believing that this was part of the "building process" Hardge had mentioned to him, Howard did not seek immediate medical atten-

---

[3] Priapism can result in increased pressure and a loss of blood flow to the penis, which can lead to a permanent scarring of the spongy penile tissue—a condition known as penile fibrosis.

220

tion. But the following morning (nearly 36 hours after he had administered the ICP injection), Howard still had a full erection and was experiencing extreme pain. At that point, Howard returned to the BMG clinic, where Dr. Powell gave him an epinephrine injection and began draining blood from Howard's penis in order to treat his priapism. But when that effort proved unsuccessful, Dr. Powell advised Howard to seek immediate treatment at a hospital, which Howard did. The physicians at the hospital then treated Howard's priapism, but by that time he had already suffered permanent injuries, and he has been unable to attain a full erection since self-administering the ICP injection.

Thereafter, Howard filed a lawsuit against Boston Medical Group-California, LLC; Boston Medical Group-Georgia, Inc.; BMHC; Meditech Laboratories, Inc.; Dr. Powell; and Hardge, alleging that he suffered permanent injuries as a result of defendants' medical malpractice and fraud, and seeking both compensatory and punitive damages for same. During the course of discovery, Howard dismissed BMG-California and Meditech Laboratories from the lawsuit.

The case was eventually set for trial in September 2009. But less than a week before the start of trial, Howard settled with Dr. Powell and dismissed him from the lawsuit. Despite this settlement, Dr. Powell testified during trial, and a significant amount of evidence focused on the issue of whether Dr. Powell's treatment of Howard deviated from the proper standard of medical care. Additionally, Howard introduced into evidence the operations manual that BMHC provided to all BMG clinics, which instructed employees to advise patients that ICP treatments can cure ED despite the overwhelming medical consensus that ED cannot be permanently cured. Howard also introduced evidence that Dr. Powell and Hardge received significant bonuses for sales of ICP treatments, but did not receive such bonuses for prescribing oral ED medications. At the close of Howard's case, BMG and BMHC argued motions for directed verdict, which the trial court denied. And shortly thereafter, Howard's counsel informed the trial court that he had settled with BMG and was dismissing both BMG and Hardge from the case. The trial court then instructed the jury that BMG and Hardge were no longer parties and that the jury would not be required "to decide any of the claims of Mr. Howard against those two defendants."

After BMHC—the sole remaining defendant—closed its case, the trial court instructed the jury, during which it informed the jury members that they could consider whether Howard's own negligence contributed to his injuries, but reiterated that they should not be concerned with any defendant other than BMHC. The court also instructed the jury that "[t]he physician/patient relationship is a confidential one and silence or failure to disclose what should be said

or disclosed can amount to fraud." Additionally, the trial court provided the jury with a verdict form, which did not allow for the apportionment of liability or damages to any party other than BMHC.

At the trial's conclusion, the jury rendered a verdict in Howard's favor, awarding him $750,000 in compensatory damages, and further found that punitive damages were warranted. The parties then presented evidence and argument on punitive damages, after which the trial court instructed the jury on the law with regard to same. Ultimately, the jury found that BMHC intended to cause harm to Howard and awarded him $8.5 million in punitive damages.

Two weeks later, the trial court issued an order entering judgment in favor of Howard in the amount of $8,762,500, plus costs, which included a reduction based on the amount of Howard's settlements with Dr. Powell and BMG. BMHC filed a motion for j.n.o.v., or in the alternative for a new trial, arguing, inter alia, that the trial court erred in instructing the jury on the confidential nature of the physician-patient relationship, as well as a physician's duty to disclose; failing to instruct the jury on apportionment of damages; and awarding punitive damages. And after a hearing on the issue, the trial court reduced the total damages award to $7,762,500, which again included the set-off based on the other defendants' settlements, but otherwise denied BMHC's motion. This appeal follows.

1. BMHC contends that the trial court erred in instructing the jury on the confidential nature of the physician-patient relationship and a physician's duty to disclose because, inter alia, BMHC never employed Dr. Powell, and thus had no such confidential relationship with or duty to Howard. We agree.

It is well established that "[a] jury charge must be adjusted to the evidence, apt, and *a correct statement of the applicable law.*"[4] Moreover, "[t]he review of allegedly erroneous jury instructions is a legal question, and we therefore owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[5] And here, in charging the jury on the law applicable to Howard's case, the trial court gave the following instruction:

> The physician/patient relationship is a confidential one and silence or failure to disclose what should be said or disclosed can amount to fraud. A patient is entitled to believe and to rely upon his doctor's affirmative representations, and has no duty to investigate or confirm the truth or accuracy of such representations.

---

[4] *King v. Davis*, 287 Ga. App. 715, 715 (652 SE2d 585) (2007) (citation and punctuation omitted; emphasis supplied).

[5] *Carter v. Smith*, 294 Ga. App. 590, 592-93 (2) (669 SE2d 425) (2008) (footnote omitted).

BMHC objected to this instruction during the charge conference,[6] arguing that the charge was not "applicable any longer seeing that it refers to a physician/patient relationship," and "[t]he evidence is clear that Aaron Hardge is not a physician, a medical professional" and "ostensible agency is no longer a part of the case." After the trial court charged the jury, BMHC reiterated its objection. On appeal, BMHC argues that this instruction was harmful because it allowed the jury to find BMHC liable for Dr. Powell's alleged professional negligence and fraud despite the fact that BMHC was neither a physician nor Dr. Powell's employer.[7]

The law of this State "is clear that physician-patient privity is an absolute requirement for the maintenance of a professional malpractice action."[8] And "[i]t is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of a physician-patient relationship."[9] Nevertheless, the trial court instructed the jury on the physician-patient confidential relationship and a physician's duty to disclose despite the fact that no physician remained in the case and despite the fact that Dr. Powell was not a BMHC employee for which BMHC could be held vicariously liable.[10] A charge unauthorized by the evidence, "which injects into the case issues not made by the pleadings or evidence, is presumed to be harmful to the losing party, and such a charge is grounds for new trial unless it is apparent that the jury could not have been misled by it."[11] Here, the trial court's instruction was both inapt and mislead-

---

[6] This instruction was originally proposed by Howard in the form of two separate and distinct jury charges. Howard contends that the record clearly shows that BMHC did not object to the latter half of this instruction. We disagree. But even if we were inclined to accept Howard's characterization of the record, it would be of no consequence. The first half of the instruction, concerning the confidential nature of the physician-patient relationship and a physician's duty to disclose, constitutes a basis for reversal in and of itself for all of the reasons noted *infra*.

[7] The trial court also instructed the jury that "[t]he case before you is a tort case in which the plaintiff must prove by a preponderance of the evidence that the negligence or fraud of the defendant, if any, was a proximate cause of the injuries to the plaintiff."

[8] *Medical Center of Central Ga. v. Landers*, 274 Ga. App. 78, 84 (1) (b) (616 SE2d 808) (2005) (citation and punctuation omitted).

[9] *Id.* (citation and punctuation omitted).

[10] Howard claims that the complained-of instruction "was an appropriate statement of the law and was tailored to the evidence" because, *inter alia*, it allowed the jury to consider whether a confidential relationship existed between Howard and Hardge. We disagree. The instruction did not charge the jury on what it could or could not infer from the existence of a confidential relationship between Howard and Hardge, but instead invited the jury to consider the actions of Dr. Powell when deciding whether BMHC was liable to Howard, even though (1) BMHC did not employ any physicians; and (2) BMHC and Dr. Powell's employer, BMG, were separate and distinct corporate entities.

[11] *Valdez v. Power Industry Consultants, Inc.*, 215 Ga. App. 444, 446 (1) (451 SE2d 87) (1994); *see also Godwin v. Godwin*, 265 Ga. 891, 892 (1) (463 SE2d 685) (1995) (holding that trial court committed reversible error by giving a jury instruction regarding a theory of

ing[12] in that it allowed the jury to find BMHC directly or vicariously liable for Dr. Powell's alleged professional negligence and fraud, even though Dr. Powell was no longer a party and, more importantly, was never employed by BMHC.[13] Accordingly, we have no choice but to reverse the jury's verdict and the trial court's judgment and remand the case for retrial.[14]

2. In light of our holding in Division 1 of this opinion, we need not address BMHC's remaining enumerations of error.

In summary, because the trial court erred in instructing the jury on the physician-patient confidential relationship and a physician's duty to disclose, we reverse the jury's verdict and the trial court's judgment, and remand the case for a retrial consistent with this opinion.[15]

*Judgment reversed and case remanded with direction. Smith, P. J., and Mikell, J., concur.*

DECIDED JULY 12, 2011 —
RECONSIDERATION DENIED JULY 28, 2011 — 

*Holland & Knight, Sarah L. Zampell, Laurie W. Daniel*, for appellant.

*Orr & Edwards, James G. Edwards II, Cash, Krugler & Fredericks, David N. Krugler, Alwyn R. Fredericks*, for appellee.

---

recovery for which there was no evidentiary support); *Gurin v. General Motors Corp.*, 171 Ga. App. 159, 160-61 (2) (318 SE2d 830) (1984) (same).

[12] Although not the basis for our reversal, we note that the specific portion of the trial court's instruction regarding a physician's duty to disclose was also incorrect as a matter of law. Other than the information specified for disclosure pursuant to OCGA § 31-9-6.1, which is not applicable here, under Georgia law, a physician has no duty to disclose any risks associated with a particular medical treatment or procedure. *See Albany Urology Clinic, P.C. v. Cleveland*, 272 Ga. 296, 298-99 (1) (528 SE2d 777) (2000).

[13] The inherently misleading nature of the complained-of instruction is further evinced by the trial court's justification for giving the charge:

I think the principle is relevant to the jury in determining whether Mr. Hardge had a confidential relationship. I'm not sure they have to find that he had a confidential relationship, but I think they can consider since he was operating under Dr. Powell's instructions by his own testimony, they can consider the physician/patient confidential relationship in determining what Mr. Hardge's conduct should be.

[14] *See Smith v. Finch*, 285 Ga. 709, 713 (2) (681 SE2d 147) (2009) (holding that jury charge that instructed jury to disregard appellant's expert regarding standard of care was prejudicial and thus required reversal of judgment).

[15] *See American Multi-Cinema, Inc. v. Walker*, 270 Ga. App. 314, 317 (2) (a) (605 SE2d 850) (2004) (holding that errors in jury charge required reversal despite finding that the evidence was sufficient to support jury's verdict).