**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely**
**filed.**
      **http://www.gaappeals.us/rules**

**October 28, 2019**

# In the Court of Appeals of Georgia

A19A1336. CHAM et al. v. ECI MANAGEMENT CORPORATION
et al.

BROWN, Judge.

Bintou Cham, individually and as the surviving spouse of Franklin Callens, and Aeysha Harris, individually and as the administrator of the estate of Franklin Callens, (collectively "Plaintiffs") brought this wrongful death action against Cobb Six-Flags Associates, Ltd., and ECI Management Corporation (collectively "Defendants") after Callens was shot and killed in 2015 at an apartment complex owned and managed by Defendants. Following a jury verdict judgment entered in favor of Defendants, Plaintiffs appeal, contending that the trial court committed reversible error when it instructed the jury on the definition of and duty of care owed to a licensee and on assumption of the risk. Plaintiffs also contend that the trial court erred in excluding

evidence of Defendants' security expenditures. For the following reasons, we reverse the judgment in favor of Defendants and remand the case with instruction.

"On appeal, the evidence is construed most strongly to support the verdict and judgment." (Citation and punctuation omitted.) *Berryhill v. Daly*, 348 Ga. App. 221, 222 (822 SE2d 30) (2018). So construed, the evidence presented at trial showed that at the time of his death, Franklin Callens was separated from but still married to Bintou Cham. Callens was living with his girlfriend, Asia Jones, in an apartment at Concepts 21 Six-Flags ("the Complex"). Cobb Six-Flags Associates, Ltd. owns the Complex while ECI Management Corporation manages the Complex. Callens was not a party to the lease, and Jones did not list him as an occupant on the rental application. However, Callens toured the apartment with Jones and was present when she signed the lease in 2014. Jones also testified that she informed the Complex's assistant manager before she signed the lease that Callens would be living there. Jones testified that this was mentioned several times, and the assistant manager responded that it was "okay" for Callens to live in the apartment as long as Jones paid the rent.[1] A prior manager for the Complex testified that Defendants' policy required all people over the age of 18 living in the apartment to be listed on the lease.

The parties do not dispute that the area surrounding the apartment complex was

---

[1] The assistant manager did not testify at trial.

experiencing a high level of crime in the years leading up to Callens' death. Evidence presented at trial showed that from August 2012 to the date of Callens' murder in December 2015, multiple burglaries, armed robberies, fights, three carjackings, and one sexual assault occurred at the Complex. The Complex manager at the time of Callens' death testified that random gunshots were a "regular occurrence." Jones testified that while she was unaware of most of the crime occurring in the Complex, she did witness a man being robbed at gunpoint outside of her apartment sometime in the summer of 2015.

Until 2013, Defendants used a private contract security force to patrol the Complex. In response to the increased crime, Defendants retained off-duty Cobb County police officers to patrol the Complex at various times, beginning in May 2013. The Complex did not have video cameras, gates, controlled access, or a courtesy officer.

On the morning of December 13, 2015, Callens left the apartment to go to work. As Callens approached his car in the Complex's parking lot, two males accosted him at gunpoint and stole his car, laptop, and firearm.[2] Callens died of a gunshot wound on the scene.

---

[2] The two males were later indicted on multiple charges, including felony and malice murder, in connection with the incident.

1. *Jury Instructions.* Plaintiffs contend that the trial court erred by instructing the jury on the standard of care owed by an owner of premises to a licensee and on the affirmative defense of assumption of the risk. "A [jury] charge on a given subject is justified if there is even slight evidence from which a jury could infer a conclusion regarding that subject." (Citations omitted.) *Almassud v. Mezquital*, 345 Ga. App. 456, 458 (1) (811 SE2d 110) (2018). However, the "charge must be adjusted to the evidence, apt, and a correct statement of the applicable law." (Citation and punctuation omitted.) *Monitronics Intl. v. Veasley*, 323 Ga. App. 126, 138 (4) (746 SE2d 793) (2013). Appellate review of a jury charge is a legal question, and we apply the "plain legal error" standard of review. *Boston Men's Health Ctr. v. Howard*, 311 Ga. App. 217, 221 (1) (715 SE2d 704) (2011). We thus owe no deference to the trial court's ruling. Id.

(a) *Duty owed to licensee.* Plaintiffs contend that the trial court erred by instructing the jury on the definition of and duty owed to a licensee because the evidence presented at trial supports the theory that Callens was either an invitee or a trespasser, but not a licensee.[3] According to Plaintiffs, if Defendants impliedly consented to Callens living in the apartment, he would be an invitee; but if Callens

---

[3] The trial court also instructed the jury on the duty owed to an invitee and a trespasser.

4

was living in the apartment without Defendants' permission and in violation of the lease, Callens was a trespasser.

> The legal duty of care owed by a landowner to a person coming upon the property varies and is fixed according to the legal status of the person entering the premises. A landowner owes the highest duty — the duty of ordinary care — to an invitee. OCGA § 51-3-1[.] A landowner owes a lesser duty — to avoid causing wilful or wanton injury — to a licensee. OCGA § 51-3-2 (b)[.]

(Citations omitted.) *Freeman v. Eichholz*, 308 Ga. App. 18, 20 (1) (705 SE2d 919) (2011). "An invitee is one who, by express or implied invitation, has been induced or led to come upon premises for any lawful purpose; he may be deemed an invitee if his presence on the property is of mutual benefit to him and the owner or occupier." (Citations omitted.) *McGarity v. Hart Elec. Membership*, 307 Ga. App. 739, 742 (706 SE2d 676) (2011). Pursuant to OCGA § 51-3-2 (a), "a licensee is a person who (1) [i]s neither a customer, a servant, nor a trespasser; (2) [d]oes not stand in any contractual relation with the owner of the premises; and (3) [i]s permitted, expressly or impliedly, to go on the premises merely for his own interests, convenience, or gratification."

> [W]hether a person is an invitee or a licensee depends upon the nature of his relation or contact with the owner (or tenant) of the premises. If the relation solely benefits the person injured, he is at most a licensee.

If, on the other hand, the relation was of mutual interest to the parties, he is an invitee.

*Chatham v. Larkins*, 134 Ga. App. 856, 857 (2) (216 SE2d 677) (1975). See also *Freeman*, 308 Ga. App. at 21-22 (1) (test to determine whether one is an invitee or a licensee is whether a "mutuality of benefit" exists between the owner/occupier and the party coming onto the premises). "Georgia has adopted the rule that a social guest is not an invitee but is a licensee." (Citation and punctuation omitted.) *Thompson v. Oursler*, 318 Ga. App. 377, 378 (733 SE2d 359) (2012). Accordingly, "a landlord is liable to one injured while visiting a tenant for his (the visitor's) own personal advantage only for wilful or wanton injury to the visitor, a licensee." (Citations omitted.) *Brown v. Clay*, 166 Ga. App. 694, 695 (305 SE2d 367) (1983).

In *Brown*, supra, we held that the plaintiff, who was living with a friend in the friend's rented room, was a licensee. 166 Ga. App. at 695. The friend allowed the plaintiff to stay in his room as a favor to the plaintiff. Id. The landlord was unaware of the arrangement and did not allow tenants to have overnight guests. Id. The plaintiff testified that he had given the friend money each week to help with rent, a fact the friend disputed. Id. This Court concluded that the primary purpose of the plaintiff's stay was for his own convenience and benefit and that the plaintiff's voluntary payment of some rent to the tenant was merely incidental to this purpose.

6

Id. at 696.

In the instant case, there was evidence to support a finding that Callens was a licensee. As explained above, if the primary purpose of Callens' presence on the property was of "mutual benefit to the tenant and guest," Callens' legal status would be that of an invitee. See *Brown*, 166 Ga. App. at 695. Jones testified that Callens paid rent in exchange for living in the apartment, arguably a mutual benefit to Jones and Callens. However, the jury was not required to credit this testimony. Indeed, some evidence presented at trial suggested that Callens was living in the apartment without permission. But, even if Callens was living in the apartment without Defendants' permission and in violation of the lease, Callens could still be considered a social guest of Jones, the authorized tenant; and therefore permitted on the premises by the tenant for his "own interests, convenience, or gratification" and without any contractual relation to Jones or Defendants. See *Brown v. Dickerson*, 350 Ga. App. 137 (828 SE2d 376) (2019) (rule in Georgia is that social guest is a licensee not an invitee); *Thompson*, 318 Ga. App. at 378 (same). But see *Chatham*, 134 Ga. App. at 858 (2) (noting that legal status of social guest is licensee, but concluding that plaintiff bringing food to a tenant in an apartment complex at the tenant's request could be considered an invitee because a jury could find the requisite mutuality of interest between the tenant and the visitor). For these reasons, the trial court did not

err in charging the jury on the duty owed to a licensee in addition to the duty owed

to an invitee and trespasser, and allowing the jury to resolve Callens' legal status. See

*Rubio v. Davis*, 231 Ga. App. 425, 428 (3) (500 SE2d 367) (1998).

(b) *Assumption of the risk*. Plaintiffs argue that the trial court erred in charging

the jury on assumption of the risk. In Georgia,

> [t]he affirmative defense of assumption of the risk bars recovery when
> it is established that a plaintiff, without coercion of circumstances,
> chooses a course of action with full knowledge of its danger and while
> exercising a free choice as to whether to engage in the act or not. In
> Georgia, a defendant asserting an assumption of the risk defense must
> establish that the plaintiff (1) had actual knowledge of the danger; (2)
> understood and appreciated the risks associated with such danger; and
> (3) voluntarily exposed himself to those risks.

(Citation omitted.) *Teems v. Bates*, 300 Ga. App. 70, 72-73 (1) (684 SE2d 662)

(2009). As we have previously explained,

> [t]he knowledge requirement does not refer to a comprehension of
> general, non-specific risks. Rather, the knowledge that a plaintiff who
> assumes the risk must subjectively possess is that of the specific,
> particular risk of harm associated with the activity or condition that
> proximately causes injury.

(Citation omitted.) *Saulsbury v. Wilson*, 348 Ga. App. 557, 559-560 (1) (823 SE2d

867) (2019). "Knowledge of the risk is the watchword of assumption of the risk, and

means both actual and subjective knowledge on the plaintiff's part." *Fuller v. McCormick*, 340 Ga. App. 636, 639 (1) (a) (i) (798 SE2d 280) (2017). "[T]he extent to which a plaintiff assumes the risk of injury caused by another's action or inaction depends upon the extent to which the plaintiff subjectively comprehended the specific hazard posed, and affirmatively or impliedly assumed the risk of harm that could be inflicted therefrom." *Muldovan v. McEachern*, 271 Ga. 805, 808 (2) (523 SE2d 566) (1999).

Defendants argue that a charge on assumption of the risk was authorized because Callens was aware of the ongoing crime at the Complex, including the incident in which a resident was robbed at gunpoint outside of Jones' apartment, and chose to remain at the Complex. However, knowledge of some vague possibility of criminal activity is insufficient. See, e.g., *Saulsbury*, 348 Ga. App. at 559 ("[t]he knowledge requirement does not refer to a comprehension of general, non-specific risks"); *Findley v. Griffin*, 292 Ga. App. 807, 809 (666 SE2d 79) (2008). In order for Callens to have assumed the risk in the instant case, there must be evidence that Callens had *specific knowledge* of the presence of the two armed men outside his apartment, but nonetheless made the conscious decision to proceed outside to his car. See *Monitronics*, 323 Ga. App. at 139-140 (4) ("a charge on assumption of the risk would have been appropriate here only if there was evidence, circumstantial or

otherwise, that [plaintiff] had *specific knowledge* that a violent intruder was inside her home but, nevertheless, chose to stay"). No such evidence was presented at trial.

Further, as Plaintiffs point out in their brief, Defendants, in essence, are arguing that anyone who chose to remain on the property, as either a resident or guest, consented to assume the risk of being shot and killed. See *Roberts v. King*, 102 Ga. App. 518, 520-521 (1) (116 SE2d 885) (1960) ("[a]ssumption of risk in its simplest and primary sense means that the plaintiff has given his express consent to relieve the defendant of an obligation of conduct toward him and to take his chance of injury from a known risk"). Such reasoning is obviously flawed, particularly in a case in which Defendants have steadfastly maintained that they implemented reasonable security measures under the circumstances. Cf. *Jackson v. Post Properties, Inc.*, 236 Ga. App. 701, 704 (3) (513 SE2d 259) (1999) (complex's argument that plaintiff failed to exercise ordinary care by moving to a ground floor apartment "untenable" because it suggests that complex admits that its apartments were defectively designed and that any tenant who lives on ground floor assumes all risk of criminal attack). See also *Monitronics*, 323 Ga. App. at 138-140 (4).

Under these circumstances, the instruction on assumption of the risk was "inapt, incorrect, and not reasonably raised or authorized by the evidence." *Monitronics*, 323 Ga. App. at 140 (4). And, "[a] charge unauthorized by the evidence,

10

which injects into the case issues not made by the pleadings or evidence, is presumed to be harmful to the losing party, and such a charge is grounds for new trial unless it is apparent that the jury could not have been misled by it." (Citations and punctuation omitted.) *Boston Men's Health Ctr.*, 311 Ga. App. at 222 (1). As this is not a case where we can say it is apparent that the jury could not have been misled, the judgment must be reversed and a new trial held. See *Berryhill*, 348 Ga. App. at 224 (1). "Assuming that the evidence presented at the retrial is the same as that which was adduced here, no charge on assumption of the risk should be given." (Citation and punctuation omitted.) Id.

2. *Defendants' security expenditures.* Plaintiffs lastly contend that the trial court erred in excluding evidence of Defendants' security expenditures. Specifically, Plaintiffs argue that they should have been allowed to present evidence showing that Defendants' increased security expenditures constituted only a small percentage of Defendants' security budget. Because this issue will likely reoccur, we address this enumeration of error and hold that the trial court erred in not conducting a balancing test under OCGA § 24-4-403.

During opening statements, Defendants emphasized that they went from "spending 17 to $18,000 a year to spending $62,000 a year, 100, 200, 300 percent [increase]," but that they "had a budget . . . [were] a business who had a security

11

budget." During the presentation of their case, Plaintiffs called Cynthia Pigg, the previous property manager of the Complex, seemingly for the purposes of cross-examination. During Defendants' subsequent direct examination of Pigg, the following transpired:

> [DEFENSE COUNSEL]: And what was being paid on an annual basis in 2012, when you just had — at that period of time, was it just the Enforcers on-site?
> [WITNESS]: Yes.
> [DEFENSE COUNSEL]: What was being paid on an annual basis at that time to the Enforcers?
> [WITNESS]: It's $18,162.50.
> [DEFENSE COUNSEL]: All right. The next year is when you started, first of all, adding Cobb [County] Police. Did you add Cobb Police to the Enforcers?
> [WITNESS]: Yes, I did.
> . . .
> [DEFENSE COUNSEL]: And what was the cost in '14 for that amount?
> . . .
> [WITNESS]: Would be $61,930.
> [DEFENSE COUNSEL]: So, in response to the events that occurred on the property, some of these things that you've gone through, was there an increase or a change in how that particular property was secured?
> [WITNESS]: Yes.

Plaintiffs then asked the following on re-cross examination of Pigg:

> [PLAINTIFFS' COUNSEL #2]: Okay. What percentage of ECI's budget went to security patrol?
> [WITNESS]: I do not remember a number.
> [PLAINTIFFS' COUNSEL #2]: Okay. So, you don't know the percentage of the budget that went towards patrols in 2013 or 2014?
> [WITNESS]: I do not.
> [PLAINTIFFS' COUNSEL #2]: And you don't know the percentage of

the total revenue that went towards those types of patrols?

Defense counsel objected, and a bench conference was held:

> [DEFENSE COUNSEL]: Your Honor, revenue is not admissible on this. What their revenue is, what their — that goes to trying to create a situation where you have a business that has a certain amount of dollars and you try to do that to prejudice the jury. That's not admissible in this case.
>
> [PLAINTIFFS' COUNSEL #1]: Judge, they interjected multiple times how much they were paying. He's not going to interject how much the total revenues are, but it's certainly fair to point out how that while they pointed at a number, this witness doesn't have any idea what percentage of the revenues would be. They want to create the impression that this is a big financial burden and we know it's not.
>
> [DEFENSE COUNSEL]: And I didn't object to that question, I allowed it. It's when he starts going in to what is the revenue —
>
> [PLAINTIFFS' COUNSEL #1]: He didn't say what is the revenue.
>
> [PLAINTIFFS' COUNSEL #2]: I did not say that. I said what percentage.
>
> [COURT]: Well, it's the same — same as asking what the revenue is. You have a finite amount and you're asking what percentage of the total.
>
> [PLAINTIFFS' COUNSEL #1]: I don't think there's any — if they want to interject the number of how much they were paying, they interjected it.
>
> [PLAINTIFFS' COUNSEL #2]: They're trying to say a certain amount is reasonable, but there's no context to put that in.
>
> [DEFENSE COUNSEL]: Well, that's up to the experts to put in. Their expert did not say our percentage of budget was not enough. That's not evidence in the case. So, in this case — and there's no relevance as to what percentage of total budget it is.
>
> [PLAINTIFFS' COUNSEL #1]: So, why are you asking her about the same things?
>
> [DEFENSE COUNSEL]: I didn't. I asked her about the amount, whether the amount was reasonable.
> . . .
> [COURT]: I think this is moving over to the question of what is the

13

financial worth of the Defendant[s]. I think, to the extent it gets into that, I'm going to sustain the objection.

Plaintiffs next called Wade Gibson, the Complex's manager at the time of Callens' death, for the purpose of cross-examination:

> [PLAINTIFFS' COUNSEL #1]: Okay. And were you aware that when you started in 2013, per the evidence that's in, that the officers were on the premise, between Enforcers and off-duty police, about 33 percent of the time?
> [WITNESS]: Again, I don't know percentages.
> [PLAINTIFFS' COUNSEL #1]: Were you aware, per the evidence that's in, that in 2014 it was reduced to 25 percent of the time?
> [WITNESS]: Again, I don't know percentages. I know that our costs increased a lot for how much we paid for those services between 2013 and 2015.
> [PLAINTIFFS' COUNSEL #1]: Do you know what percent of the budget that expenditure took up?

Defense counsel objected, and the trial court sustained the objection. Counsel for Plaintiffs then asked to approach the bench "to get some clarity," and the following transpired:

> [PLAINTIFFS' COUNSEL #1]: I thought the budget question — oh, I'm sorry. I thought the budget question was okay, but the revenue question was not.
> [DEFENSE COUNSEL]: It's percentage that can show income.
> [PLAINTIFFS' COUNSEL #1]: I'm not going to ask about revenue, just the percentage of budget. There's no evidence as to what the total budget is, and I'm not going to interject into that.
> [COURT]: I'm going to sustain the — I think it goes basically, it's then saying —
> [PLAINTIFFS' COUNSEL #1]: Well, I apologize then. I didn't mean to

disrupt — I thought incorrectly, I guess.

Plaintiffs argue that, as a result of the trial court's ruling, they were unable to counter Defendants' narrative that switching from private security to off-duty Cobb County police officers represented a substantial budgetary expense, or Defendants' implication that additional security costs would drive up the rental rate.

"[I]n cases where punitive damages are not in issue, evidence of a party's wealth or financial status is generally inadmissible unless directly relevant to issues in the case." (Citations omitted.) *Chrysler Group v. Walden*, 303 Ga. 358, 367 (II) (A) (812 SE2d 244) (2018). However, such evidence is not categorically inadmissible. Id. Instead, the admissibility of party-wealth evidence is a fact-specific analysis in which the trial court must determine whether the evidence is relevant under OCGA § 24-4-401 ("Rule 401") and more prejudicial than probative under OCGA § 24-4-403 ("Rule 403"). See id. at 362 (II) (A), 367 (II) (A) ("Rules 401, 402, and 403 overlay the entire Evidence Code, and are generally applicable to all evidence that a party seeks to present."). In analyzing party wealth under Rule 403, "the concern is the relevance of the evidence to the case and the risk of bias against the wealthy party on the part of the jury." Id. at 369 (II) (A). "[T]he application of the Rule 403 test is a matter committed principally to the discretion of the trial courts." (Citation and

punctuation omitted.) Id. at 370 (II) (B).

Here, the trial court concluded that because the evidence was "moving over to the question of what is the financial worth of the Defendant[s]," it should be excluded, apparently relying on Georgia's common law rule categorically barring party-wealth evidence. See *Chrysler*, 303 Ga. at 364-366 (II) (A) (Georgia's common law rule relating to the relevance of party-wealth evidence is no longer in force, and "Georgia courts must consider party-wealth evidence under the parameters of the new Evidence Code"). On remand, the trial court should first determine whether the evidence is relevant to an issue in this case. If so, the trial court should then conduct a balancing of the evidence under Rule 403, determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Finally, we remind the trial court that "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." (Citation and punctuation omitted.) *Chrysler*, 303 Ga. at 370 (II) (B). See also *Jones v. State*, 301 Ga. 544, 546 (1) (802 SE2d 234) (2017).

*Judgment reversed and case remanded with direction. Barnes, P. J., and Mercier, J., concur.*